Thomas Clinton SMITH, Jr., Appellant,

v.

Dr. Alexander H. FLAX, André R. Barbeau and Institute for Defense Analyses, Appellees.

No. 78–1201.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 9, 1979.

Decided April 9, 1980.

---

John D. Grad, Alexandria, Va. (Leonard S. Rubenstein, Hirschkop & Grad, P. C., Alexandria, Va., on brief), for appellant.

Thomas M. Lemberg, Washington, D. C. (Leva, Hawes, Symington, Martin & Oppenheimer, Washington, D. C., William T. Freyvogel, Adams, Porter, Radigan & Mays, Arlington, Va., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, and BUTZNER and RUSSELL, Circuit Judges.

HAYNSWORTH, Chief Judge:

The plaintiff sought damages for alleged violations of the Age Discrimination in Employment Act. His basic claims were submitted to a jury, which returned a verdict in his favor. Thereafter, however, the district judge granted the defendants' motion for judgment notwithstanding the verdict or, alternatively, for a new trial. The plaintiff appealed, and we affirm.

Prior to 1971 Smith had been employed by the Rand Corporation as an analyst. He had been working on problems of logistics, but became concerned about his continued employment by Rand when its work on logistical problems seemed to be running out. He sought employment by the Institute for Defense Analyses in its Systems Evaluation Division. It is a private, non-profit organization engaged in analyzing high level management problems, primarily for the Department of Defense. It is a "think tank," employing professionals of varied backgrounds and talents and demanding of them a very high level of competence.

In early 1971 the director of the Systems Evaluation Division was looking for a logistician, and the Division had work for the Department of Defense involving logistics. Smith was employed. He was then fifty-two years old.

Annually, the professional employees of the Division are rated by the director. Early in 1972 Smith was given a rather high rating by the director. He noted that Smith's work had not until then produced a report, but he thought that Smith was well into the project and that his effort seemed to be effective. On a scale of 1 through 7, he rated Smith at 5.

The initial February 1972 rating of Smith seems to have been done by Director André Barbeau's predecessor, though that report

also is signed by Director Barbeau. By January 1973, however, Barbeau had experienced some disappointment in Smith's performance. With Smith, he had attended a session to brief General Kent, the head of the Defense Department's Weapons System Evaluation Group (WSEG), the office within the Department of Defense which worked with the Division on most of its projects. General Kent, Mr. Barbeau and Mr. Smith all testified that Smith was unable to answer the General's questions in that session. Later, he did produce a draft of a final report of which General Kent and Mr. Martin of the Institute of Defense Analyses were quite critical, though, after some revision by another, it was later accepted.

In his January 1973 evaluation of Smith, Barbeau expressed his disappointment with Smith in his performance as leader in the Harrier Sortie Rate Project. He recorded his evaluation of Smith on that project as mediocre, and he gave him a general overall rating of 3, which is just about minimum requirements.

In January 1974, Barbeau again gave Smith an overall rating of 3. In the preceding year Smith had been working on problems of logistics. He noted Smith's attention to detail, his comprehension of complex computer outputs, and his patience in working with others. He noted his thought that Smith lacked imagination, however, and that he would not make a good project leader. He thought Smith's principal weaknesses were his inability to focus on important issues and to write and speak effectively on them. He expressed the thought that there would be a place for Smith in the Division as long as they had logistical work, but doubted that Smith was versatile enough to do other kinds of analyses.

In January 1975 Barbeau's rating of Smith dropped to 2, though his written evaluation was much the same as it had been in the preceding year. He thought that Smith was useful in the logistics field, but thought that he lacked versatility.

In 1976 Barbeau's rating of Smith dropped to 1. He said that Smith was a hard worker, but lacked the ability to focus on the more important aspects of a problem, and he tended to get lost in minutiae. A rating of level 1 means that job performance is considered unacceptable and not up to requirements.

When Smith had been working on logistical projects he had been under the general supervision of assistant director Freck. That work ran out in 1975, however, and he was put to work in a test and evaluation project under the general supervision of the other assistant director, Dr. Transue. Dr. Transue regarded Smith's work on that project as unacceptable, and he had recommended to Barbeau the rating of Smith at level 1. Since there were no more logistical projects, Smith was told in the spring of 1976 to look for other employment. He remained at the Division, however, until the fall of 1976 when he was terminated.

The managers of the Division, Barbeau, Freck and Transue, testified about their evaluations of Smith and the consultative processes which preceded them. They testified that in the field of logistics his work was acceptable, if not distinguished, but that his work in other fields was not acceptable. Dr. Flax, the president of the Institute for Defense Analyses, and other witnesses were of the same opinion. Of course, the defense witnesses testified that age had nothing to do with the low level of his salary increases during the period of his employment or his termination.

The decision finally to terminate his employment was based in substantial part upon the unacceptable rating he got for his performance on the Ewarval Project, and upon a conversation Barbeau had shortly before with Sylvia Waller, the Ewarval Project leader. Mrs. Waller wanted Smith's retention. She admired his industry and willingness to work late, and she was concerned about his finding employment. Barbeau asked her if she would accept Smith as a member of the team on any future project of which she was the leader. She replied that she would not, and Barbeau responded that her negative response provided her answer.

The plaintiff testified that he was a competent analyst who could work in fields other than logistics.

The plaintiff sought to support his estimate of his competence by testimony from two former associates at Rand, from a project officer from WSEG, and others within the Institute of Defense Analyses. Since the defendants offered the testimony of General Kent, a project officer from WSEG and others, there developed a conflict in the testimony about the acceptability of Smith's performance on the Harrier Project, but to the extent that these witnesses testified to Smith's competence, it arose out of observation of his work in the field of logistics. The plaintiff did offer the testimony of Mrs. Waller, who testified that she thought that Smith was not a poor analyst, but, since Smith's work had been dropped from the project of which she was the leader, she disclaimed any ability to express a general evaluation of him. To the extent that any praise should be found in her testimony, it was obliterated by the testimony of her conversation with Barbeau shortly before Smith's termination. She agreed that she had told Barbeau that she would not have Smith as a member of any team of which she was the leader.

Plaintiff contended that Barbeau improperly typecast him because of his age as possessing competence in a narrowly defined area. The evidence does not support this claim. Indeed, testimony from both sides indicated that plaintiff's expertise was narrow even within the field of logistics. For example, Mr. Davis, plaintiff's co-worker at Rand, stated that Smith was more adept at detailed logistics work than at broad analysis. Mr. Freck also characterized Smith's logistics work as focusing on numerical detail and lacking in interpretive breadth. Finally, Colonel Stockstill, the WSEG project officer and co-worker of plaintiff on a logistics study for the Institute, found Smith good at gathering data but weak at analytical tasks. The Colonel testified that he would not want Smith to work on future projects with him.

That Smith also really perceived his competence as narrow is strongly suggested by the fact that, when work in logistics seemed to be running out at Rand, he moved to the Division for work in that field.

The plaintiff offered some statistical data showing that the rate of salary increases for younger analysts was greater than that for older analysts, from which he suggests some support for an inference of discrimination. As defense witnesses testified, however, it seems plain that the data offers no support for the inference. Increases were given on a merit basis, and the performance of a young analyst gains with experience at a greater rate than that of an older, already experienced, analyst. Moreover, for the older, more highly paid analysts, there were salary ceilings that had to be taken into account.[1]

The statistical evidence as a whole fails to support plaintiff's case. The average age of the Division's professionals at the time of Smith's discharge was forty-four. Six were employed during the period shortly before and shortly after Smith's departure, and of those three were over 40, being respectively, forty-eight, fifty-two, and fifty-five years old when they were hired. Indeed, thirty percent of the Division's professionals at the time of Smith's discharge had been over the age of forty at the time of their initial employment. During the period since 1973 only three analysts over forty, including Smith, had been discharged and nine had been hired. In the spring of 1974, most of the most highly paid analysts, twenty-seven of thirty-two, were forty years old or older; seven in the group of twenty-six being paid at a lower salary level were forty years old or over.[2]

---

[1]. No one could be paid more than $45,000 without congressional approval, and approval of the Department of Defense was required at a lower ceiling.

[2]. The plaintiff contests the relevance of this data derived from a period a few months after his departure, but it is readily translatable to earlier periods. Moreover, it is independently relevant since the relationship between salary

Plaintiff sought to establish that he was replaced by younger employees. He did show that younger persons were hired into the Systems Evaluation Division at about the time of his discharge and that two of these new employees worked on a project on which he had been employed. Barbeau testified, however, that the project to which Smith referred was one to which he was temporarily assigned pending his departure. It required an expertise in nuclear physics which plaintiff lacked but which the new employees possessed. Thus Smith was not "replaced" on that project. Indeed, Barbeau's uncontroverted testimony established that no one replaced Smith at the Division. His expertise in logistics was no longer required, because no logistics work remained.

Smith also attempted to establish through nonstatistical evidence the Division's alleged preference for youth. Three employees testified that they perceived in Barbeau a tendency to favor younger employees, especially in the selection of project leaders. Their testimony was conclusory and lacked specific factual examples. In contrast, Barbeau testified that thirteen of nineteen Division project leaders were forty or older, and that eight were over the age of fifty.

There was testimony that Barbeau and others had made statements such as that the Division's future lay in its young Ph. D's, and that all employees at some time reached the peak in efficiency. Rather than indicating a discriminatory purpose, however, such statements seem only truisms. In any enterprise, today's juniors will be tomorrow's seniors. Today's seniors can help create a foundation for tomorrow's growth and prosperity, but future realization of the potential of an enterprise lies principally with those who will be in positions of leadership and responsibility in the future. So, too, every individual at some time reaches a peak in efficiency. The peak may be relatively flat over a considerable period of time, but surely it will begin to wane if the individual lives long enough. That is not to suggest in any way, however, that the individual should be replaced at the first sign that efficiency is somewhat less than it was some years ago.

There was simply no evidence of a youth movement within the Division. The evidence shows beyond question the employment of a number of individuals in their forties and fifties at the time of their initial employment. The record is quite inconsistent with a purpose to replace people in those age groups with younger ones.

■ If we assume that Smith made out a prima facie case under the ADEA, it was sufficiently rebutted.

■ Such a prima facie showing is rebutted if the employer shows a legitimate non-discriminatory reason for the employee's discharge. *Board of Trustees v. Sweeney*, 439 U.S. 24, 25 n.2, 99 S.Ct. 295, 296 n.2, 58 L.Ed.2d 216 (1978); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).[3] After the employer has come forward with such evidence, the ultimate burden of persuasion remains upon the plaintiff to show that age was a determining factor in his discharge. *Loeb·v. Textron, Inc.*, 600 F.2d 1003, 1011–12 (1st Cir. 1979); *Marshall v. Airpax Elecs., Inc.*, 595 F.2d 1043, 1044 (5th Cir. 1979); *Marshall v. Westinghouse Elec. Corp.*, 576 F.2d 588, 592 (5th Cir. 1978). Of course, the question should not be taken from the jury if there is evidence in the case which, if accepted by the jury, would support a finding that age was a determining factor in the discharge, but we conclude there is insufficient evidence to support such a finding in this case.

levels and ages does not undergo radical change over a short period, given the number of employees involved.

3. While *Sweeney* and *McDonnell Douglas* construe Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, we perceive no diffi-

culty in utilizing them for purposes of guidance in this age discrimination case. *See Loeb v. Textron, Inc.*, 600 F.2d 1003, 1010 (1st Cir. 1979); *Cova v. Coca-Cola Bottling Co.*, 574 F.2d 958, 959–60 (8th Cir. 1978).

Smith, of course, testified that he had versatility, and that his competence as an analyst was not confined to the field of logistics. Smith's perception of himself, however, is not relevant. It is the perception of the decision maker which is relevant. The decision to terminate Smith was reached only after a process of much consultation and inquiry focusing upon his capability of performing, up to Division standards, in analytical work after the logistics work had come to an end. An attempt was made to utilize him in work the Division had in 1976, but no one came forward who found his performance acceptable. Mrs. Waller, who admired his industry, testified in his behalf, but she disclaimed an ability to evaluate his performance. That she had found it inadequate, however, is rather dramatically illustrated by her admission that she, indeed, had told Barbeau that she would not accept Smith as a member of any team of which she was the leader.

Unquestionably there was testimony which would support a finding that in the area of logistics Smith's performance as an analyst was at an acceptable level, but there was simply no testimony that he had performed acceptably in other areas. There was a difference of opinion among witnesses of his competence even in the field of logistics, but Barbeau's earlier assessment of Smith's limited usefulness was borne out by experience in 1975 and 1976. Indeed, the fact that he was kept on for many months after it was determined that he could not perform at an acceptable level of competence on the work then available within the Division shows a high degree of patience and consideration for Smith.

We conclude that the entry of judgment notwithstanding the verdict was proper.

*AFFIRMED.*