Robert A. **GEMMELL**

v.

**FAIRCHILD SPACE & DEFENSE CORPORATION.**

Civ. No. JFM–92–1520.

United States District Court,
D. Maryland.

Feb. 10, 1993.

Chet D. Levitt, Mindy G. Farber, Rockville, MD, for plaintiff.

David A. Copus, Deena B. Jenab, Jones, Day, Reavis & Pogue, Washington, DC, for defendant.

### MEMORANDUM

MOTZ, District Judge.

Robert A. Gemmell has brought this action against Fairchild Space & Defense Corporation ("Fairchild") under the Age Discrimination In Employment Act of 1967, 29 U.S.C. Section 621 *et seq.* (1988). Discovery has been completed, and defendant has moved for summary judgment.

### I.

A. *The Events Up To November, 1989*

Fairchild hired plaintiff in August 1982 as its manager of test operations. In that

capacity he was responsible for "test resources" (designing manufacturing and production tests) and "production tests" (actual testing of products on the manufacturing floor). Five months after he began work, plaintiff was relieved of his responsibility over production tests and during the next three years he supervised only the test resources function. In 1986 the production test group was again assigned to plaintiff, and he was promoted to the position of Director, Testing Resources/Production Test.

On October 12, 1987, Fairchild hired Richard Bair as vice president in charge in operations. Bair promptly reorganized the department and promoted plaintiff, who was then age 56, into the newly-created position of director of operations engineering. In that position plaintiff's responsibilities were extended to two additional functions: manufacturing engineering (which established procedures for manufacturing) and industrial engineering (which established the manufacturing plant layout).

In May 1988 Bair formally evaluated plaintiff's performance in his new position. Bair gave plaintiff an overall rating of 3.1 under a rating system where a 3.0 was "competent." However, plaintiff was given a rating of only 2.7 (placing him in the "fair" range) as to his new responsibilities.[1] The evaluation included goals which plaintiff was expected to meet and Bair's appraisal of his degree of success in meeting those goals:

| MAJOR GOALS | BAIR'S ASSESSMENT |
|---|---|
| * Assume additional responsibilities for Manufacturing Engineering department, and Industrial Engineering department to consolidate all of operation engineering under one Directorate. | This task requires a major strength in technical leadership. In some ways we need to affect a cultural change in how we look at factory support. |
| * Develop an Industrial Engineering Department within the Directorate. Start with a Supervisor and four engineers in 1988. | The staff is in place, however, the impact of the group is in its infancy. Strong technical leadership is required and cost control is important. |
| * Job knowledge | [Plaintiff's] test expertise is well known. He needs to become a recognized leader in the other disciplines of Operations Engineering. |
| * Leadership | [Plaintiff] needs to become recognized as the technical leader of Operations in all areas. Work is required. |

Over the next months plaintiff failed to meet Bair's expectations of him. It became increasingly apparent that at bottom there was a fundamental disagreement between the two of them about management style. Plaintiff believed in an essentially passive management approach whereby he would delegate substantial responsibilities to his subordinates and problems would filter up to him through a staged process. According to his deposition testimony, he "believed in using as little supervision as possible" while Bair believed in "using as much supervision as possible." As plaintiff understood it, Bair believed in manag-

1. Under Fairchild's rating system, "competent" means "Fully meets overall performance requirements. Work is acceptable in quantity and quality." "Fair" means "Development and improvement required in some areas."

ers being "intimately involved in the technical problem solving at the employee level." Therefore, Bair wanted him to be "the focal point for the major technical problem solving." Plaintiff, however, thought "that was not possible" and would result in "a bottleneck." In short, according to plaintiff, Bair expected him "to be the center of everything coming in" whereas plaintiff believed "that if you have good managers under you, that they should be given the reins to do their job and most of the stuff should definitely go through them."

In December 1988 Bair met with plaintiff and told him of his "extreme displeasure with the way his [plaintiff's] organization was performing." Bair defined the main problem as "management involvement and attitude" and he warned plaintiff that he "was considering moving [plaintiff] back to his previous assignment." Plaintiff, however, continued to believe that his management style was correct. Therefore, rather than making any substantive changes to the way in which he approached his responsibilities, he merely increased the flow of information which he provided to Bair. When asked on deposition if he "did ... anything over the next 6 months after this December 1988 meeting, anything significantly different during the following 6 months in the way you approached your job," he responded:

> Well, basically I made sure that I went in more often to him and told him what was happening rather than have the other guys go in and keep him informed. So when he gave somebody an assignment, I made sure that I was aware of it and either I went in myself to tell him what was happening or I went in with the person so that I was more visual with this type of thing.... Like I said, I don't recall major things. I just made sure that he was more aware of what I was doing.[2]

In June 1989 Bair again formally evaluated plaintiff's performance. He gave him an overall rating of 2.1. The evaluation included the following comments:

We are basically in a reactionary mode. J. German is pushing the program but it could use more of [Plaintiff's attention]. [Plaintiff's] test expertise is well known but he has not put forth the needed effort to understand the other disciplines of Manufacturing Engineering.

Bob needs to become recognized as the technical leader of Operations in all areas. Work is needed.

Within a week of giving plaintiff his performance appraisal, Bair placed him on formal written probation. Bair's letter to plaintiff stated as follows:

> Your performance as Director of Operations Engineering during the past year has continued to decline and you have not met the expectations or requirements of the job. We had a very serious discussion in December 1988 in which I defined for you my areas of concern about your performance and improvements required. Since I have seen no substantial improvements in the areas defined, I feel that the use of a probationary period is necessary to affect the required improvement in your performance.

> The purpose of this letter is to clearly identify my areas of concern, describe needed changes and define the ground rules for the probationary period.

> There are three areas of your performance that fall short of the job requirement; your leadership in technical problem solving, your managerial relationship with your department and your specific management skills and how they affect your relationship with other departments.

Plaintiff's response to being placed on probation was essentially the same as had been his response to the performance evaluation he had received a year earlier. Again, he made no substantive changes in his approach but merely increased the amount of information which he provided to Bair.

Q. Did you do anything significantly differently during the probationary peri-

---

**2.** Plaintiff never became willing to alter his management style. As he testified on deposi-

tion, Bair "never came around" to his view and he "never went around" to Bair's view.

od than you had done during the previous 6 months or year?

A. Significantly, not that I can think of offhand. Basically seeing people, interfacing with them, talking, just getting around to see people to see what was going on and I did that before anyhow.

You see, a lot of the things, what he accused me of not doing I had been doing, so it really didn't make much change because I still went and saw people and talked to them in other departments.

[Q.] What did you think about the suggestion that you were supposed to be personally involved and take the lead in every major technical problem-solving effort?

A. I kept him informed. As far as I got involved with every major technical problem, I still let Feaster or German, if it was theirs, or Charlie Ray lead it, if it was their problem and they were the expert in the area. But I got involved just like I was before and I made sure that I was out on the floor with every problem area as I was before. The only thing I did different was to make sure that I went in and gave Bair the status on it.

On November 1, 1989, Bair ended plaintiff's probation. Defendant ordinarily fires employees who fail to meet what is expected of them while on probation, and Bair considered firing plaintiff. However, he was advised by Fairchild's personnel department that he could not do so. Therefore, instead of discharging plaintiff, he demoted him three levels to a position of staff engineer.

B. *The Events Leading To Plaintiff Being Laid Off*

In November 1990 Jack Frohbieter became Fairchild's Chief Operating Officer. He immediately began a restructuring campaign to deal with what he referred to as the "urgent need to ... reorganize [Fairchild] in a more cost effective way." He directed that Fairchild's managers conduct a "complete review" of Fairchild's organization structure with a view toward making the organization "lean."

In December 1990 Frohbieter held a meeting with the company's managers. Plaintiff attended the meeting. Frohbieter emphasized that Fairchild needed "to eliminate layers of management" between the worker and the company president. He referred to what he wanted to achieve as a "flat management." Otherwise stated, Frohbieter intended to eliminate "the traditional concept of chain of command" and "to wring out of [Fairchild] everything ... that doesn't add value." Plaintiff agreed with what Frohbieter said, recognizing that the plan "meant layoffs [were] coming."

On January 9, 1991, a memorandum was sent to Fairchild's managers requesting them, *inter alia*, to provide a "list of employees that comprise 5% of your total organization that are your least productive or needed as you look at your 1991 requirements." Shortly thereafter, Bair eliminated plaintiff's staff engineering job.

Bair did not, however, lay plaintiff off at the time. Instead, he created a vacancy for plaintiff in the job of test resources manager by demoting Bob Feaster, who had been the test resources manager for 3½ years, to the position of Supervisor, Test Resources. In turn, Bair demoted the existing supervisor, Kim Adams, back to the working engineer level.

As 1991 progressed, layoffs did occur and the number of engineers performing the test resources function decreased to eight. On deposition plaintiff acknowledged that as a result two layers of management between the engineer on the floor and Bair were unnecessary. Bair had to choose between keeping Feaster or plaintiff. As plaintiff conceded on deposition, Feaster's performance evaluations had been superior to his own. Feaster had demonstrated effective leadership skills and substantive expertise at the technical level. In contrast, as recited above, plaintiff had demonstrated an unwillingness to become involved in technical problem solving at the worker level. Accordingly, Feaster was retained in his supervisor position, plaintiff's manager position was eliminated and plaintiff was laid off.

## II.

The proof scheme in Title VII cases, which has been adopted in ADEA litigation, is well established. A plaintiff must first prove a *prima facia* case; the defendant must then articulate a legitimate non-discriminatory reason for the challenged action; and plaintiff must then prove that the reason articulated by the defendant is pretextual. *See generally Goldberg v. B. Green & Co.*, 836 F.2d 845 (4th Cir.1988).[3] Since it is undisputed that plaintiff was laid off, that he was in the age group protected by the ADEA at the time and that other persons not within that age group were not laid off, he has established a *prima facia* case. Fairchild, in turn, has articulated non-discriminatory reasons for laying plaintiff off. Therefore, the focus of inquiry becomes whether plaintiff has presented sufficient evidence to meet his burden of proving that these reasons are pretextual.

Plaintiff has failed to do so. The record is uncontradicted that plaintiff's demotion from the position of director of operations engineering (which eventually led to his being laid off) was due to the fact that he believed in a different management style than did Bair and was unwilling to alter his own approach. Likewise, it is undisputed that he was laid off as part of a major restructuring of Fairchild intended to make the company's organization more lean, eliminating layers of management and imposing upon managers the responsibility to solve technical problems at the working level. The record amply demonstrates that it was in this area that plaintiff's qualifications were weakest, and he has not come forward with any evidence indicating that he was technically stronger than Bob Feaster, the supervisor whom Fairchild retained in his stead.

The arguments which plaintiff makes in an effort to demonstrate the alleged pretextual nature of the reasons articulated by Fairchild to demote and eventually discharge him are entirely unpersuasive. First, he contends that if an employer is permitted to take adverse action against employees on the ground that they believe in a passive management style and are resistant to change, the employer will use these articulated reasons as code words for discharging older employees. This argument totally ignores the evidence in this case. Plaintiff's disagreement with Bair over management style was not a creature of Fairchild's invention or a figment of its imagination. It was a fact which plaintiff himself fully acknowledges.[4]

Second, plaintiff contends that Fairchild violated its own regulations by keeping plaintiff on probation for as long as it did. According to plaintiff, while Fairchild kept him on probation for five months, its policy states that a probationary period typically is no less than thirty days and no more than ninety days. The logic of this argument is incomprehensible. Fairchild's usual policy is to discharge an employee who fails to meet the goals of his probation. Thus, to extend plaintiff's probation was to benefit him. Moreover, although Fairchild

3. Fairchild suggests that since it promoted plaintiff when plaintiff was 56 years old, the usual proof scheme does not apply in this case. *Cf. Proud v. Stone*, 945 F.2d 796, 797–98 (4th Cir.1991); *Lowe v. J.B. Hunt Transport, Inc.*, 963 F.2d 173, 174–75 (8th Cir.1992) (holding that the proof scheme does not apply where adverse action is taken against recently hired employees within the protected age group). I need not decide that issue here since I find that Fairchild has articulated non-discriminatory reasons for its actions and that plaintiff has not presented sufficient evidence to show that these reasons are pretextual.

4. Although it is not entirely clear, perhaps what plaintiff is arguing is that an employer should not be permitted to take adverse action against an employee who believes in a passive management style and is resistant to change because older people tend to have these characteristics. If he is making that argument, it is wholly without merit. First, it reflects the very prejudice against which the ADEA is intended to protect. There are many "older" people who do not simply sit back in their chairs, who know how to work and who have the energy and desire to learn new things (just as there are many "younger" people whose world view is essentially passive.) Second, even assuming that those traits are associated with advancing age, "Congress made plain that the age statute was not meant to prohibit employment decisions based on factors that sometimes accompany advancing age, such as declining health or diminished vigor and competence." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1016 (1st Cir.1989).

did demote plaintiff when his probation was over, it did not fire him.

Third, plaintiff contends that Bair wrongfully gave him a formal letter of reprimand on May 6, 1991 in connection with an incident during which plaintiff allegedly disclosed a confidential organizational chart (portending imminent layoffs) to other employees. Further, he complains that Fairchild recited the circumstances giving rise to the reprimand in responding to the charge which he filed with the Equal Employment Opportunity Commission in this case. Alleging that he did not commit the breach of confidentiality of which he was accused, plaintiff asserts that Fairchild's actions reflect bad faith. Fairchild asserts that there is ample circumstantial evidence from which it can be inferred that plaintiff did disclose the chart or that, at least, provided it a basis to believe in good faith that he had done so. Whatever the merits of this dispute, I need not resolve it because plaintiff has presented no evidence causally connecting the reprimand to his layoff.

Fourth, plaintiff asserts that since January 1990 of the 56 management employees discharged as part of Fairchild's reduction in force, 53 were over the age of 40 and therefore in the age class protected by the ADEA. This statistic, the only one cited by plaintiff, by itself proves nothing. In order to have meaning, it must be compared against the age composition of the work force from which the employees were laid off. Plaintiff has presented no evidence on this point.

Finally, plaintiff avers that in October 1989 Bair had a conversation with Charles Ray, another Fairchild employee, which reflected Bair's bias against older workers. Bair purportedly told Ray that because of his age (then 59) and educational background, he had little chance for advancement before he retired at age 65. Although this remark might seem somewhat disturbing, it is far from sufficient to provide a basis for withstanding Fairchild's summary judgment motion. It was made more than a year and a half before the decision was made to lay off plaintiff and

had nothing to do with discharging plaintiff (or anyone else) because of his age. Moreover, the remark was little more than a "truism" since there was, in fact, little chance that within the six years between Ray's then age of 59 and his intended retirement age of 65, he would be able to obtain sufficient education to make any substantial advancement within the company. *See Smith v. Flax*, 618 F.2d 1062, 1066 (4th Cir.1980). Finally, Ray remembers that in this same conversation Bair compared him favorably to plaintiff, saying that he (Ray) "could adopt to different situations, but that people like Robert Gemmell were more or less set in their ways because of their age and were unable to change or adapt to different situations." This comment evidences that Bair does not stereotype people because of their age but is able to draw reasonable distinctions, assessing employees upon their traits and characteristics, not their longevity.

In sum, Fairchild has articulated nondiscriminatory reasons for the actions which it took, and plaintiff has not presented sufficient evidence to meet his burden of proving that these reasons were pretextual. Accordingly, Fairchild is entitled to the summary judgment which it seeks. A separate order to that effect is being entered herewith.

## ORDER

For the reasons stated in the memorandum entered herein, it is, this 10th day of February 1993

ORDERED

1. Defendant's motion for summary judgment is granted; and

2. Judgment is entered in favor of defendant against plaintiff.