**Wendell ANGLIN, Plaintiff,**

v.

**PROGRESS ENERGY SERVICE COMPANY, Defendant.**

**No. 5:08–CV–76–FL.**

United States District Court, E.D. North Carolina, Western Division.

Aug. 10, 2009.

Anthony M. Brannon, James E. Hairston, Hairston Lane Brannon PLLC, Raleigh, NC, for Plaintiff.

Jonathan Travis Hockaday, Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP, Raleigh, NC, for Defendant.

## ORDER

LOUISE W. FLANAGAN, Chief District Judge.

This matter is before the court on defendant's motion for summary judgment.

(DE # 22.) Plaintiff has responded in opposition, defendant has replied, and the issues raised are ripe for ruling. For the reasons set forth herein, defendant's motion is granted.

## STATEMENT OF THE CASE

Plaintiff Wendell Anglin ("plaintiff") filed complaint on February 7, 2008 in the Superior Court of Wake County, North Carolina,[1] alleging defendant Progress Energy Service Company ("defendant") discriminated against him on the basis of race in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and in violation of North Carolina public policy.[2] Plaintiff is an African–American male who was fired by defendant on November 6, 2006. Defendant removed the action to this court on February 28, 2008. After the court granted several extensions of discovery and motions deadlines, defendant filed the instant motion on March 12, 2009.

## STATEMENT OF UNDISPUTED FACTS

The undisputed facts are as follows.[3] Defendant company provides various administrative, management, and corporate support services to subsidiaries of Progress Energy, Inc. Plaintiff began working for defendant in March 2001. (Anglin Dep. 6.) During the months leading up to plaintiff's termination in November 2006, plaintiff was employed by defendant as a Senior Human Resources Benefits Special-

ist. (*Id.*) In that capacity, plaintiff was directly supervised by DeWayne Walters ("Walters"), an Employee Service Center Program Team Manager. (Walters Decl. ¶ 2–3.) Walters reported to John Gray ("Gray"), Director for Human Resources Services, who in turn reported to Anne Huffman ("Huffman"), Vice President of Human Resources. (Gray Decl. ¶ 3; Huffman Decl. ¶ 3.)

In his position as Senior Human Resources Benefits Specialist, plaintiff was responsible for supervising defendant's workers' compensation benefits programs in Florida. (Anglin Dep. 6–7.) He regularly interacted with third-party administrators to monitor the status of workers' compensation matters in that state, and he had the authority to assign cases to specific law firms. (Walters Decl. ¶ 3, Anglin Dep. 6–8.) Plaintiff traveled to Florida at least four times a year to meet with vendors, law firms, and attend conferences and conventions relating to workers' compensation. (Walters Decl. ¶ 3.)

Diane Harrington ("Harrington") is an employee of defendant responsible for handling workers' compensation claims for employees in North Carolina and South Carolina. Like plaintiff, Harrington regularly interacted with outside vendors, including lawyers, nurse case managers, and third-party administrators. (Harrington Decl. ¶ 2–3.) Thus, until plaintiff's termination, Harrington and plaintiff were co-

---

1. Prior to that date, plaintiff obtained an order from the Superior Court of Wake County extending the time to file a complaint.

2. In response to defendant's motion for summary judgment, plaintiff expressly abandoned his claims for retaliation under Title VII and for intentional or negligent infliction of emotional distress. Because the retaliation and emotional distress claims were, as plaintiff acknowledged, legally deficient, the court grants summary judgment in favor of defendant as to those claims.

3. The court notes that plaintiff's memorandum in response to the motion for summary judgment does not contain a "short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried," as required by Local Rule 7.2(a)(5), EDNC. Plaintiff thus appears to take no issue with the material facts set forth in defendant's memorandum, including defendant's description of the investigation into allegations against plaintiff.

workers with similar responsibilities for workers' compensation claims in different regions. On August 29, 2006, Harrington received a phone call from Jeff Lowery ("Lowery"), an employee of Broadspire, a third-party administrator for workers' compensation claims filed by defendant's employees. (*Id.* ¶ 4.) Lowery informed Harrington that he had received complaints from several Broadspire employees of lewd comments made by plaintiff during a file-review meeting at Broadspire's offices and during a meeting in Orlando earlier in August 2006. (*Id.*) Lowery also told Harrington that the Orlando law firm Moore, Peterson & Zeitler had stopped handling defendant's workers' compensation claims because plaintiff had made inappropriate comments to several of its female employees. (*Id.*) Harrington knew that defendant had received a letter from that Orlando law firm stating, without reason, that it would no longer represent defendant. (*Id.*) Believing that the company's Code of Ethics required her to report the conversation with Lowery, Harrington placed a call to defendant's Ethics Line for that purpose on August 31, 2006. (*Id.* ¶ 5.)

In early September 2006, Suzanne Ennis ("Ennis"), defendant's Associate General Counsel, contacted Dawn Siler–Nixon ("Siler–Nixon"), an outside attorney, to investigate the allegations made against plaintiff through the Ethics Line. (Siler–Nixon Decl. ¶ 3.) Siler–Nixon is a partner with Ford & Harrison, LLP, a national labor and employment law firm, and she regularly conducts investigations into alleged employee wrongdoing. (*Id.* ¶ 2.) In this case, Siler–Nixon was asked to investigate allegations that plaintiff had made inappropriate comments to employees of some of defendant's outside vendors. (*Id.* ¶ 3.) Siler–Nixon was not asked to find inculpatory evidence against plaintiff, but to conduct an independent investigation into the allegations. (*Id.* ¶ 13.) In investigating plaintiff's conduct, Siler–Nixon followed the same process that she follows in other investigations for other companies. (*Id.*)

Siler–Nixon began her investigation by interviewing David Smiler ("Smiler"), an employee of Broadspire who had worked with plaintiff. (*Id.* ¶ 4.) The telephone interview took place on or about September 26, 2006. Among other accounts of plaintiff's behavior, Smiler reported to Siler–Nixon that (1) when he and his supervisor, Kristen Cannell ("Cannell"), were manning a booth at the workers' compensation convention in Orlando, plaintiff pulled Smiler aside to ask if Cannell "go[es] both ways" and "is she bi[sexual];" (2) that plaintiff hugged and tried to kiss Smiler's boss; (3) that plaintiff told him he had asked Loni Shutler ("Shutler"), a female Broadspire case manager, if she wanted to go back to his room with him early one morning during the convention, and when Shutler responded that she had to pick up her boyfriend the next day, plaintiff responded to the effect, "well, I know why you're not going to bed with me is that you want to keep it tight for him;" (4) that plaintiff made lewd comments to Debrah Zeitler ("Zeitler"), an attorney at Moore, Peterson & Zeitler, who handled defendant's workers' compensation cases; and (5) that a former Broadspire nurse told Smiler that her husband did not want her working with plaintiff because of the sexual comments plaintiff had made to her. (Siler–Nixon Decl. Ex. A.)

Siler–Nixon met with both Smiler and Cannell in Cannell's office on October 6, 2006. (*Id.* ¶ 5.) During that interview, Cannell reported that she had not directly heard any sexually-related comments by plaintiff and had not received any complaints from any employee regarding such comments. (*Id.* Ex. B.) Smiler repeated a number of the incidents he had explained in his earlier telephone interview, and re-

ported, in addition, that during the Orlando convention, plaintiff directed Smiler to look at a woman and said, "check that [expletive] out," and "that blonde chick, I'd like to get into that." (*Id.*) Smiler reported that plaintiff told him he "wanted to get into that" after seeing Cannell holding hands with someone, and that plaintiff had made multiple comments about Shutler, including inviting Smiler to "check out her [expletive]" when plaintiff and Smiler were walking behind Shutler. (*Id.*)

On October 10, 2006, Siler–Nixon interviewed Zeitler, the attorney who regularly represented defendant in connection with its workers' compensation claims, and who regularly worked with plaintiff in that capacity. (*Id.* ¶ 6.) Zeitler was reluctant to speak with Siler–Nixon about plaintiff's behavior, but ultimately reported that she believed plaintiff's behavior toward her was best described as harassment. (*Id.* Ex. C.) Zeitler reported that plaintiff would often, while flirting with her, point out that he held the power to assign defendant's cases to other law firms, and that he would decide whether to assign a new case to a certain lawyer based on whether the lawyer gave him her home phone number. (*Id.*) Zeitler further reported that she had refused plaintiff's suggestion that he come to her house before a business dinner, and that plaintiff asked if the reason she would not allow him to come to her house was that she was afraid he would rape her. (*Id.*)

Siler–Nixon interviewed Elaine Blout ("Blout") on October 19, 2006. (*Id.* ¶ 7.) Blout owns Paragon, a company that provides nurse case manager services to defendant in connection with its workers' compensation cases. (*Id.*) Blout worked with both plaintiff and Smiler in that capacity. During her interview with Siler–Nixon, Blout reported that she attempted to shield her female employees from plaintiff because, based on plaintiff's prior com-

ments, she feared he "might cross the line," and she did not want to be "open to exposure" or face potential liability. (*Id.* Ex. D.) Blout reported that plaintiff gave compliments which were "a little bit over the line," such as referring to a woman's figure by noting that she had "junk in her trunk." (*Id.*)

On October 25, 2006, Siler–Nixon interviewed Teri Noplis ("Noplis"). (*Id.* ¶ 8.) Noplis was formerly a Nurse Telephonic Case Manager for Broadspire and had interacted regularly with plaintiff in that capacity. (*Id.*) Noplis reported that she felt plaintiff was a "womanizer" whose conduct was "totally inappropriate." (*Id.* Ex. E.) She told Siler–Nixon that plaintiff "badgered and harassed" her almost daily and always sought to engage in personal conversations with her. (*Id.*) According to Noplis, plaintiff routinely referred to women as "hot" and said he wanted to get to know them. (*Id.*) Noplis reported that upon first meeting plaintiff, he followed her around the office, repeatedly asked for the name of her hotel, and insisted that she go to dinner with him. (*Id.*) Although Noplis complained to her supervisors at Broadspire about plaintiff's conduct, no actions were taken. (*Id.*) Noplis told Siler–Nixon that she did not want to create any further waves or sue Broadspire, so she left the company. (*Id.*)

Siler–Nixon provided copies of her notes from these interviews to Ennis, defendant's Associate General Counsel. (*Id.* ¶ 9.) Then, on November 1, 2006, Siler–Nixon interviewed plaintiff in Raleigh. (*Id.* ¶ 10.) Siler–Nixon asked plaintiff about the behavior and comments reported by Smiler, Cannell, Zeitler, Blout, and Noplis, and plaintiff admitted many of the allegations in whole or in part. (*Id.*) Specifically, plaintiff admitted, among other things, (1) to telling Shutler he knew the reason she did not want him to come to

her hotel room was because she wanted to "keep it tight" for her boyfriend; (2) to making comments such as "she's hot" and "she's got junk in her trunk" regarding women in the presence of vendors; (3) to questioning Smiler regarding Cannell's sexual preferences and making comments about her and another woman; (4) to dancing closely with female vendors at conventions; and (5) to greeting Broadspire employees with a hug and kiss on the cheek. (*Id.* Ex. F.)

Following Siler–Nixon's interview with plaintiff, Walters, plaintiff's supervisor, met with plaintiff and, consistent with company policy, placed him on paid administrative leave pending the outcome of the investigation. (Walters Decl. ¶ 5.) Siler–Nixon then met with Huffman, Gray, Walters, Ennis, and Melinda Burrows, who, at the time, was defendant's Deputy General Counsel, to orally report the findings from her investigation.[4] (Siler–Nixon Decl. ¶ 11; Huffman Decl. ¶ 5; Gray Decl. ¶ 5; Walters Decl. ¶ 6.) In sum, Siler–Nixon reported that several employees of outside vendors, including a partner at a law firm, had reported that plaintiff made inappropriate comments and/or had engaged in inappropriate conduct, and that plaintiff had admitted to many of the allegations. Siler–Nixon also reported that she believed the reports were credible, based on the demeanor of the individuals interviewed, including a reluctance to participate in the investigation due, in part, to a concern of retaliation by plaintiff, the number of individuals reporting similar inappropriate conduct by plaintiff, the specific examples provided, and plaintiff's own admissions. (Siler–Nixon Decl. ¶ 12.)

After hearing the report of Siler–Nixon's investigation, Walters, Gray, and Huffman collectively decided to terminate plaintiff's employment. (Huffman Decl. ¶ 6; Walters Decl. ¶ 7; Gray Decl. ¶ 6.) On

November 6, 2006, Walters met with plaintiff and informed him that his employment was being terminated for violating the company's Code of Ethics, effective immediately. (Walters Decl. ¶ 8.)

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate, under Rule 56(c), "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). A fact is material if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, the court construes evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmovant's favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the nonmoving party must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting FED. R.CIV.P. 56(e)).

---

4. Siler–Nixon later submitted a written report, dated November 13, 2006.

## II. Analysis

■ Title VII makes it "an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e–2(a)(1). Generally speaking, a plaintiff in a Title VII suit may "avert summary judgment ... through two avenues of proof." *Hill v. Lockheed Martin Logistics Mgmt. Inc.*, 354 F.3d 277, 284 (4th Cir.2004). A plaintiff may proceed on a "pretext theory," by establishing that the reason given by the employer for the discharge is just a pretext for discrimination using the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), or the plaintiff may proceed on a "mixed-motive theory," by demonstrating through direct or circumstantial evidence that even if the reason given by the employer is true, the discharge was also motivated by racial discrimination. *Hill*, 354 F.3d at 284–86. Regardless of whether a plaintiff proceeds under a mixed-motive or pretext theory, and regardless of whether a plaintiff offers direct or circumstantial evidence, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In this case, plaintiff purports to proceed under both the pretext and mixed-motive theories, and so the court considers each in turn.

■ Under the burden-shifting pretext framework, the employee must first establish a *prima facie* case of discrimination. To prove a *prima facie* case of racially motivated termination, plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) he was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances. *See, e.g., Bryant v. Bell Atl. Maryland, Inc.*, 288 F.3d 124, 133 (4th Cir.2002); *Hughes v. Bedsole*, 48 F.3d 1376, 1383 (4th Cir.1995). Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to produce evidence that it terminated plaintiff's employment for a legitimate, nondiscriminatory reason. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If defendant meets this burden, then plaintiff must prove, by a preponderance of the evidence, that defendant's articulated legitimate nondiscriminatory reason was a pretext to mask unlawful discrimination. *Id.* at 804, 93 S.Ct. 1817; *Hill*, 354 F.3d at 285.

■ Plaintiff has failed to establish a *prima facie* case of discrimination. Although plaintiff satisfies two elements of the *prima facie* case—he is a member of a protected class, and he was fired—he is unable to satisfy the remaining elements. To establish the second element of the *prima facie* case for disparate treatment in termination, plaintiff must show that his job performance was satisfactory, that is, that he was meeting defendant's legitimate expectations. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir.2003). In determining whether a plaintiff was meeting legitimate expectations, " 'it is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir.1996) (quoting *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir.1980)).

In this case, the evidence is undisputed that defendant received allegations regarding inappropriate behavior by plaintiff, that an independent investigation re-

vealed numerous reports from outside vendors of inappropriate behavior by plaintiff, that plaintiff admitted to some of the conduct, and that Siler–Nixon, the outside investigator, reported these findings to plaintiff's superiors along with her conclusion that the reports were credible. Plaintiff has put forth nothing to rebut evidence that Huffman, Walters, and Gray honestly believed, based on Siler–Nixon's report, that plaintiff's behavior violated the company's Code of Ethics, compromised the company's reputation, and put its relationships with outside vendors at risk. Although plaintiff disputes the facts and proper characterization of some of the incidents reported to Siler–Nixon, he does not deny that the reports were made, that Siler–Nixon found them credible, or that she orally reported the results of her investigation to the decision makers who ultimately decided to terminate plaintiff's employment. Based on this evidence, plaintiff can not show that he was meeting defendant's legitimate expectations at the time of his termination.

Plaintiff also fails to show that similarly situated employees outside the protected class were retained under circumstances similar to those leading to his termination. Although plaintiff vaguely asserts that Roger Johnson, a white male, was treated less harshly because of his race, and that "numerous others" were also treated differently because of their race, plaintiff has provided no evidence that Johnson or others were similarly situated to plaintiff in terms of the seriousness of misconduct, the presence of any mitigating or differentiating circumstances, and the identity of the decision makers. *See, e.g., Heyward v. Monroe,* No. 97–2430, 1998 WL 841494 (4th Cir. Dec. 7, 1998) (unpublished) (noting that a plaintiff must show that the alleged comparators "are similar in all relevant respects," including the involvement of the same supervisors); *Holtz v. Jefferson Smurfit Corp.,* 408 F.Supp.2d 193, 206

(M.D.N.C.2006) ("[T]he employee must generally show the same decision maker made the disparate employment decisions."). Rather, the undisputed evidence shows that the supervisors responsible for terminating plaintiff were aware of no other employee under their direct or indirect supervision within defendant's Human Resources department who had been accused of engaging in the same or similar conduct as plaintiff.

■ Because plaintiff can not show that his performance was satisfactory at the time of his termination, or that any similarly situated employee outside his protected class was treated more favorably than he was, he fails to establish a *prima facie* case. Even assuming *arguendo* that plaintiff could establish a *prima facie* case, defendant has offered undisputed evidence that plaintiff was terminated because of reports that he engaged in inappropriate and lewd behavior with outside vendors in violation of the company's Code of Ethics. Accordingly, even if plaintiff established a *prima facie* case, defendant has met its burden of articulating a legitimate, nondiscriminatory reason for plaintiff's discharge.

■ Plaintiff has put forth no evidence showing that defendant's proffered legitimate reason for firing him was mere pretext for unlawful discrimination. Although plaintiff questions the fairness and adequacy of defendant's investigation into the reports of his misconduct, he admitted at deposition that he does not believe Siler–Nixon held any racial bias against him, and that he has no reason to doubt that she accurately reported to his supervisors the results of her interviews with various outside vendors. In any event, "Title VII is not a vehicle for substituting the judgment of a court for that of the employer," *Jiminez v. Mary Washington College,* 57 F.3d 369, 377 (4th Cir.1995), and "when an em-

ployer articulates a reason for discharging the plaintiff not forbidden by law, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *De-Jarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir.1998) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410–11 (7th Cir.1997)).

Plaintiff's denials of certain conduct reported by the individuals interviewed by Siler–Nixon and belief that he should not have been terminated are also insufficient to avoid summary judgment under the pretext framework. Apart from plaintiff's unsubstantiated allegations of discrimination, there is no evidence suggesting that defendant's proffered explanation is unworthy of credence. *See Evans*, 80 F.3d at 960 ("While a Title VII plaintiff may present direct or indirect evidence to support her claim of discrimination, unsupported speculation is insufficient."); *Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir.1988) (noting that plaintiff's own opinions and conclusory allegations do not have sufficient "probative force to reflect a genuine issue of material fact"). Rather, the undisputed evidence shows that Huffman, Gray, and Walters received and considered Siler–Nixon's report regarding the investigation into allegations of misconduct against plaintiff, believed based on the report that plaintiff had violated the Code of Ethics, and decided to terminate plaintiff's employment for that reason. Accordingly, defendant is entitled to summary judgment on plaintiff's claim of unlawful discrimination under the pretext theory.

■ So too is defendant entitled to summary judgment under plaintiff's mixed-motive theory. Under that theory, a plaintiff may establish a claim of discrimination by showing through direct or circumstantial evidence that race motivated the employer's adverse employment decision. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003); *Hill*, 354 F.3d at 285. "The employee, however, need not demonstrate that the prohibited characteristic was the sole motivating factor to prevail, so long as it was a motivating factor." *Hill*, 354 F.3d at 284; *see also* 42 U.S.C. § 2000e–2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race ... was a motivating factor for any employment practice, even though other factors also motivated the practice."). To establish a mixed-motive claim, " 'a plaintiff need only present sufficient evidence,' direct or circumstantial, 'for a reasonable jury to conclude, by a preponderance of the evidence, that race ... was a motivating factor for any employment practice.' " *Hill*, 354 F.3d at 285 (quoting *Desert Palace*, 539 U.S. at 101, 123 S.Ct. 2148).

■ As discussed above, plaintiff has failed to present sufficient evidence, either direct or circumstantial, from which a jury could find that his termination was motivated in any way by race discrimination, either alone or in conjunction with any other motive. The evidence that plaintiff argues should preclude summary judgment consists exclusively of plaintiff's own factually unsupported deposition testimony regarding the impact of his race on defendant's decision making. (Pl. Resp. at 6–7.) Plaintiff speculates that he and other African–American employees were singled out because of their race, but plaintiff admitted that he knew no details about why one former employee, whose name he could not recall, was terminated, and that he knew nothing about the termination of another employee named "Chris," who told plaintiff that he was improperly fired. Furthermore, plaintiff provided no details regarding his bald assertion that several other employees told him that they had been

treated unfairly in defendant's human resources department. In any event, plaintiff's testimony regarding what other employees told him is inadmissible hearsay and does not create a genuine issue of material fact for trial. *See, e.g., McCray v. Pee Dee Reg'l Transp. Auth.*, 263 Fed. Appx. 301, 306 n. 5 (4th Cir.2008) (unpublished) (affirming dismissal of discrimination claim where "a large number of the statements put forth by [plaintiff] are based upon inadmissible hearsay, as [plaintiff] relies entirely on information relayed to him by third parties who are not party-opponents and who have not themselves provided affidavits or deposition testimony.").

Plaintiff's conclusory and vague allegations regarding defendant's discriminatory intent fail to create a genuine issue of material fact sufficient to survive summary judgment. *See, e.g., Bryant*, 288 F.3d at 134–35 (noting that subjective beliefs, without more, are insufficient to create genuine issue of material fact as to discriminatory conduct); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir.1995) (noting that mere unsupported speculation is not enough to defeat summary judgment motion). Indeed, aside from his own unsubstantiated assertions at deposition, plaintiff has presented no evidence, either direct or circumstantial, of unlawful discrimination. Rather, the record shows that defendant received an Ethics Line complaint about plaintiff's behavior from a concerned employee, that it arranged for an outside attorney to investigate the allegations, that several employees of outside vendors substantiated the allegations and described specific instances of inappropriate comments and behavior by plaintiff to Siler–Nixon, and that Siler–Nixon reported these findings, along with her conclusion that the reports were credible, to Huffman, Gray, Walters, Ennis, and Burrows before defendant decided to terminate plaintiff. Accordingly, summary judgment must be granted in favor of defendant.

Finally, the court addresses plaintiff's claim for wrongful termination in violation of North Carolina public policy. As both parties agree, the same evidentiary standards that apply to plaintiff's Title VII claim apply also to plaintiff's state law claim. Accordingly, for the same reasons that summary judgment must be granted in defendant's favor as to plaintiff's Title VII claim, summary judgment must also be granted for defendant on plaintiff's state law claim for wrongful termination.

## CONCLUSION

For the reasons set forth herein, defendant's motion for summary judgment is GRANTED. The clerk is directed to close this case.