OPINION
This is an appeal by defendants, Ameritech Corporation, Ameritech Network Services, Inc., Ameritech Services, Inc., and The Ohio Bell Telephone Company (collectively "Ameritech"), from a judgment of the Franklin County Court of Common Pleas following a jury verdict finding in favor of plaintiff, James Swiggum, on Swiggum's claim of age discrimination. Swiggum has filed a cross-appeal from the trial court's decision and entry granting defendants' motion for judgment notwithstanding the verdict as to the jury's award of punitive damages. Plaintiff William Rectanus has filed an appeal from the trial court's ruling on plaintiffs' motion to compel discovery.
On July 28, 1995, plaintiffs Swiggum and Rectanus (collectively "plaintiffs") filed a complaint naming as defendants Ameritech Corporation, Ameritech Services, Inc. and The Ohio Bell Telephone Company. The complaint alleged that plaintiffs had been terminated from their employment with defendants on the basis of age, race and sex. Plaintiffs filed an amended complaint on June 20, 1996, alleging claims for emotional distress.
On February 4, 1997, defendants filed motions for summary judgment against the plaintiffs. Plaintiffs subsequently filed separate memorandums in opposition to defendants' motions for summary judgment.
By decision and entry filed July 25, 1997, the trial court sustained in part and overruled in part defendants' motions for summary judgment. Specifically, the court sustained defendants' motion for summary judgment as to plaintiffs' claims for race discrimination and gender discrimination, but overruled defendants' motion for summary judgment as to plaintiffs' age discrimination claims.
Plaintiffs' age discrimination claims were tried before a jury beginning on September 8, 1997. The evidence adduced at trial indicates that plaintiff Swiggum was born on May 13, 1944. Swiggum, who has a master's degree in civil engineering, began working for Ameritech's predecessor, Wisconsin Bell, Inc. ("Wisconsin Bell"), in the late 1960's as an outside plant engineer. He worked at Wisconsin Bell until November 1987, and the last position he held there was as division manager for outside plant engineering.
In 1987, Swiggum began working for Ohio Bell as a division manager. His responsibilities included the Cleveland, Akron, Canton and Youngstown areas, which constituted the 216 area code at that time. In 1991, Swiggum obtained a fifth level position as a general manager working out of Columbus, and he became responsible for the areas served by the 614, 513 and 419 area codes. In 1992, his title was changed to vice president of network operations for the state of Ohio. Swiggum's final position with Ameritech was as General Manager of Network Operations, East.
On January 30, 1995, Swiggum, at age fifty, was terminated from his position. Swiggum's supervisor at the time was Robert Knowling. Swiggum was replaced on an interim basis by Helen Reedy, a forty-eight year old. Sean Boyle was eventually named to fill Swiggum's former position; Boyle was either forty-one or forty-two years of age at the time he assumed Swiggum's former position.
Plaintiff William Rectanus was born on April 3, 1945. Rectanus began working at Ohio Bell in 1966 as an installer. He later became an engineering assistant and was subsequently promoted to management. On May 24, 1995, Rectanus, age fifty, was terminated from his employment with Ameritech. Rectanus' supervisor at the time of his termination was Charles Hempfling. George Benskey replaced Rectanus; Benskey was approximately forty-five years of age at the time he assumed Rectanus' duties.
In 1993, Ameritech initiated a program termed "Breakthrough." James Eibel, a former vice president of operations for Ameritech, testified that Breakthrough came about as a result of competition in the telephone services industry following the breakup of ATT. Prior to Breakthrough, the "culture" at Ameritech was "of being entitled to customers," and Ameritech employees had a mindset of being "entitled to their jobs." (Tr. Vol. IV, 172.) Around the time of Breakthrough, "the company knew that it was going to be a completely competitive industry going forward, that kind of culture just would not make it in the competitive world." (Tr. Vol. IV, 172.) In response to this attitude, Ameritech's Chairman, Bill Weiss, initiated Breakthrough, a program geared to change the culture of entitlement to a "competitive culture, and at the same time reduce costs and improve service to what was needed to do to be competitive." (Tr. Vol. IV, 172.)
Breakthrough also involved a reorganization of the company. At the time of ATT's breakup in 1984, the chairman chose to keep Ameritech's structure in five separate state operations, with each entity retaining their own staffs, operations and sales marketing. With the advent of Breakthrough, the new structure of the company consisted of twelve business units that operated across state lines. These new units consisted of: Ameritech Consumer Services, Ameritech Custom Business Services, Ameritech Enhanced Business Services, Ameritech Small Business Services, Ameritech Telephone Industry Service, Ameritech Information Industry Services, Ameritech Long-distance Services, Ameritech Pay Phone Services, Ameritech Cellular Services, Ameritech Advertising Services, Ameritech Leasing Services and Ameritech Network Services. (Defendants' Exhibit J.)
The Breakthrough process required workers to re-apply for positions within the company. Positions were filled according to "tiers." Because there were more employees than positions available, Breakthrough also resulted in a reduction in work force. Once a manager was chosen to head an organization, the manager was given an organization chart of the positions designated to report directly to that manager. According to plaintiff Swiggum, there were a fixed number of slots available. Swiggum testified that the central theme of Breakthrough was to "reduce the force as far as possible without disrupting service." (Tr. Vol. II, 12.) During the Breakthrough process, Eibel selected Swiggum for the position of General Manager of Network Operation East.
Eibel conducted an annual performance review of Swiggum for 1993. In the summary of performance, Eibel indicated that Swiggum "did an excellent job of organizing, selecting managers and launching his organization." (Plaintiffs' Exhibit No. 2.) Under the heading of "Major Strengths," Eibel listed Swiggum's "[t]echnical knowledge of the business and understanding of customer requirements," as well as "organizing and planning." Id.
Under the heading of "Developmental Needs," Eibel listed "[b]ecoming a true breakthrough manager that leads aggressively towards achievement of revolutionary goals requiring risk, tough love and compassion." Id.
Eibel also prepared an annual performance review summary for 1994. In the summary of performance, Eibel indicated that Swiggum "had good results in many areas including craft and management downsizing but failed to meet his committed budget performance and experienced several execution errors by his team that negatively affected customer service." (Plaintiffs' Exhibit No. 1.) Eibel indicated that, for the upcoming year (1995), "Mr. Swiggum needs to improve in budget management and in service execution." Id. Eibel listed Swiggum's strengths as his knowledge of the business and personal commitment to customer services, as well as the fact that he was a team player. Eibel also listed the following developmental needs: "Service execution improvement, effectively forge into the tough personnel decisions breakthrough leaders must make without directions from their boss," and "[l]eadership in meeting established objectives."
At trial, Eibel testified that Swiggum did a good job as far as "re-engineering," and "staffing, those kinds of things. But he did a terrible job on meeting his objectives." (Tr. Vol. IV, 208.) Regarding Eibel's evaluation that Swiggum needed to improve his budget management and service execution in 1994, Eibel testified that he was under the impression that Swiggum "knew that when I said that if there wasn't any improvement I would have to take some action." (Tr. Vol. IV, 208.)
In November of 1994, Robert Knowling replaced Eibel and became Swiggum's supervisor. Knowling was thirty-nine years of age at the time he replaced Eibel to head up the network switching organization. When he took over this position, Knowling was offered performance appraisals by Eibel but Knowling declined to look at them; Knowling indicated that he wanted to form his own impression of the workers.
In early December of 1994, power outages occurred in Michigan and in Cincinnati. Knowling testified that, when he contacted Swiggum regarding the Michigan outage, Swiggum was not aware of the incident. Sean Boyle, a network reliability general manager, informed Knowling of the Cincinnati outage.
Around the time of these incidents, Knowling had a conversation with Jackie Woods, the president of Ohio Bell. Woods indicated that she was not pleased with the level of service and "she was not pleased with the effort of Jim Swiggum relative to partnering with her." (Tr. Vol. VII, 152.) Woods told Knowling that "she did not have confidence in Jim's ability to partner with her, and that he was not involved to the extent of being a collaborative business partner with her as the senior officer or the senior executive in the Ohio territory." (Tr. Vol. VII, 153.)
On December 8, 1994, there was a "brown out" in the Columbus area. Maintenance activity had been scheduled around that time, and the call capacity configuration was inadequate to handle the load. Knowling contacted Swiggum, but Swiggum was unaware of the problem at that time. The state of Ohio offices and the Governor's officer were affected by this outage, which occurred during a business day. Knowling took a role in resolving the problem after he "found that Jim did not have the data or the information and was not involved." (Tr. Vol. VII, 169.) Knowling informed his superiors, Gary Drook and Dick Notebaert, about the situation.
According to Swiggum, the first time Knowling was critical of his performance was after a "911 problem in Cleveland." (Tr. 62.) In December of 1994, around the time of the outage in Columbus, the 911 service in Cleveland was inoperable for thirty-seven hours. Swiggum stated that the shutdown was the result of an error by a technician who disconnected a circuit. The first time Swiggum became aware of the problem was when he received a call from Knowling. Knowling had been informed of the 911 outage from Ameritech's president, Notebaert. Knowling indicated to Swiggum that Notebaert was upset about the outage.
Knowling testified that, immediately after being informed of the outage, he made arrangements to travel to Cleveland. Knowling stated that when he contacted Swiggum that morning, Swiggum was not aware of the situation. Knowling instructed Swiggum to go to Cleveland, and Swiggum drove there that morning.
When Knowling arrived in Cleveland, a meeting was held for approximately four hours. Knowling had expected Swiggum to assemble the participants and to lead a discussion regarding what had happened, why it happened, and the countermeasures that were to be put in place. According to Knowling, Swiggum sat there and offered no input during the entire meeting; Swiggum was unaware of the facts and he did not offer any ideas or suggestions.
Swiggum's behavior that day made a "huge impression" on Knowling. (Tr. Vol. VII, 160.) Swiggum had no sense of urgency about the situation. Knowling stated that Helen Reedy distinguished herself that day by taking the initiative during the meeting. Reedy had command of the facts relating to the outage. Knowling was "thoroughly impressed that she was that on top of her job." (Tr. Vol. VII, 166.)
On December 19, Knowling had a face-to-face meeting with Swiggum at Knowling's office in Chicago. Knowling requested the meeting because he wanted to inform Swiggum that he was not pleased with his performance or leadership. Knowling "wanted to make sure that he understood his job was on the line relative to these concerns." (Tr. Vol. VII, 173.) During the meeting, Knowling discussed service results in Ohio and Michigan, as well as Swiggum's leadership qualities. Knowling told Swiggum that he expected him to be involved in setting direction, and to start making network events disappear within that territory. Knowling told Swiggum "the absentee management style he was demonstrating did not meet my expectations, and I felt that his team was more on top of the job than he was." (Tr. Vol. VII, 173-174.) Swiggum acknowledged that Knowling "was very concerned about what happened, and he wanted me to get more involved, and he wanted to be the one hearing from me whether there was a problem." (Tr. Vol. II, 79.) Swiggum later notified two or three of his "direct reports," and told them that he was to be contacted immediately in the event of any problems.
Knowling informed Swiggum that he wanted a complete review of all 911 service throughout the Ameritech regional companies, and he asked Swiggum to prepare a plan regarding service, cost and outages. Knowling informed Swiggum that he expected to be notified by him personally whenever there was a network event. Knowling indicated that over the next thirty days he would be making an assessment, "and if he could not come forward with the plan and an improvement in the leadership style, I would be terminating him from the business." (Tr. Vol. VII, 176.)
Over the next thirty days, Knowling "saw virtually no change in terms of his engagement in the organization." (Tr. Vol. VII, 176.) During a staff meeting with Swiggum's peers, Swiggum had virtually no input whatsoever. In early January, Knowling made a tentative decision to remove Swiggum from the position of general manager network operations east. Knowling discussed the matter with his supervisor, Drook. Knowling discussed the possibility of moving Swiggum to another position but "no one was willing to take him within their organization."(Tr. Vol. VII, 180.)
Knowling ultimately made the decision to terminate Swiggum. Knowling met with Swiggum on January 30 in Columbus to inform him that his position was being terminated. Knowling informed Swiggum that he had not seen the progress he wanted relative to his performance.
According to Swiggum's recollection of the meeting, Knowling "made the point of saying this is not performance related." (Tr. 84.) The conversation with Knowling was very brief. Knowling indicated that Helen Reedy would be filling in for Swiggum in the near term. Swiggum then met with an individual named Gary Liedel, who provided him with benefit information. Swiggum was offered six months termination pay in return for signing a release. Swiggum declined to sign the form.
Knowling denied telling Swiggum that the decision was not performance related. According to Knowling, the decision had "nothing to do with a leadership change. This was a performance issue." (Tr. Vol. VII, 183.)
Helen Reedy was put in charge of network operations east on an interim basis. Knowling chose Reedy because "she was the most qualified person who had demonstrated the right kind of attributes, and I felt there was very little risk in putting her in that job in an acting capacity." (Tr. Vol. VII, 187.) Reedy held the position on an interim basis for approximately three months. The position was permanently filled by Sean Boyle, formerly the general manager of network reliability center in Chicago. Boyle was forty-one or forty-two years of age at the time. Swiggum was fifty years of age at the time of his termination, and he had twenty-six years and eleven months of service.
Swiggum acknowledged that he stated in a deposition that he did not have any knowledge of age discrimination at Ameritech while he was working there. However, he stated that after he consulted with an attorney "it brought clearer to me that, in fact, what had been done was age discrimination against me." (Tr. Vol. II, 138.)
On September 24, 1997, the jury returned verdicts in the matter. Specifically, regarding the age discrimination claim of plaintiff Rectanus, the jury found in favor of defendants and against Rectanus. As to the claim by plaintiff Swiggum, the jury found in favor of Swiggum, and further found that defendants acted with actual malice in terminating Swiggum's employment. The jury awarded Swiggum back pay in the amount of $299,952.83, and front pay in the amount of $507,736.72. The jury also awarded Swiggum $150,000 in emotional distress damages, and $1,000,000 in punitive damages.
By entry filed September 29, 1997, the court entered judgment in favor of Swiggum in the amount of $1,957,689.55, plus interest. The court also entered judgment in favor of defendants and against plaintiff Rectanus.
On October 14, 1997, defendants filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial or remittitur. By decision and entry filed July 14, 1998, the trial court overruled defendants' motions for judgment notwithstanding the verdict on liability or, in the alternative, for new trial. The court further overruled defendants' motion for judgment notwithstanding the verdict as to compensatory damages and for a new trial or remittitur. However, the court sustained defendants' motion for judgment notwithstanding the verdict on the issue of punitive damages.
On August 10, 1998, plaintiff Rectanus filed a notice of appeal from the trial court's decision and entry filed July 14, 1998. On August 13, 1998, defendants filed a notice of appeal from various judgments and orders of the court, including the decision and entry filed July 14, 1998. Plaintiff Swiggum filed a cross-appeal from the trial court's July 14 decision and entry sustaining defendants' motion for judgment notwithstanding the verdict on punitive damages. The cases were consolidated for appeal.
On appeal, defendants set forth the following four assignments of error for review:
 I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT AMERITECH'S MOTIONS FOR DIRECTED VERDICT AND ITS MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT BECAUSE PLAINTIFF FAILED TO ESTABLISH A PRIMA FACIE CASE OF AGE DISCRIMINATION.
 II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING STATISTICS CONCERNING THE AGES OF INDIVIDUAL WHO LEFT THE COMPANY.
 III. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING EVIDENCE REGARDING OFFERS TO SETTLE PLAINTIFFS' AGE DISCRIMINATION CLAIMS.
 IV. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO GRANT AMERITECH'S MOTION FOR A NEW TRIAL BECAUSE THE JURY'S VERDICT IS CONTRARY TO THE WEIGHT OF THE EVIDENCE.
Plaintiff Rectanus asserts the following single assignment of error for review:
 THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DID NOT COMPEL DEFENDANTS TO PRODUCE DISCOVERY SOUGHT BY PLAINTIFFS.
Plaintiff Swiggum sets forth the following single assignment of error on cross-appeal:
 THE TRIAL COURT ERRED IN STRIKING THE JURY'S AWARD OF PUNITIVE DAMAGES AGAINST DEFENDANTS.
We will first address the assignments of error raised by defendants. Under the first assignment of error, defendants assert that the trial court erred in failing to grant Ameritech's motions for directed verdict and for judgment notwithstanding the verdict.
The standard of review for ruling on a motion for directed verdict is the same one applicable to a motion for judgment notwithstanding the verdict. Posin v. A.B.C. Motor CourtHotel, Inc. (1976), 45 Ohio St.2d 271, 275. A motion for directed verdict will be granted only "after construing the evidence most strongly in favor of the party against whom the motion is directed" and finding "that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." Civ.R. 50(A) (4).
Defendants primary contention under the first assignment of error is that plaintiff Swiggum failed to establish a prima facie case of age discrimination. In Byrnes v. LCI CommunicationHoldings Co. (1996), 77 Ohio St.3d 125, 128-129, the court held:
 R.C. 4112.02 makes it unlawful for an employer to discharge without just cause or otherwise discriminate against a person with respect to any matter related to employment on the basis of age. R.C. 4112.14 (formerly R.C. 4101.17) specifically prohibits an employer from discriminating against a job applicant or discharging without just cause any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job.
 In Mauzy v. Kelly Services, Inc. (1996), 75 Ohio St.3d 578, 664 N.E.2d 1272, this court clarified the methods for establishing a prima facie case of age discrimination under R.C. 4112.14. The methods are the same for R.C. 4112.02, at issue here. Discriminatory intent may be established indirectly by the four-part analysis set forth in Barker v. Scovill, Inc. (1983), 6 Ohio St.3d 146, 6 Ohio B. Rep. 202, 451 N.E.2d 807, adopted from the standards established in McDonnell Douglas Corp. v. Green (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. The Barker analysis requires that the plaintiff-employee demonstrate "(1) that he was a member of the statutorily-protected class, (2) that he was discharged, (3) that he was qualified for the position, and (4) that he was replaced by, or that his discharge permitted the retention of, a person not belonging to the protected class." Id., paragraph one of syllabus.
 Discriminatory intent may also be established by direct evidence of age discrimination, which is evidence other than the four-part demonstration of Barker. Kohmescher v. Kroger Co. (1991), 61 Ohio St.3d 501, 575 N.E.2d 439. A plaintiff may establish a prima facie case by presenting evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory intent. Mauzy, 75 Ohio St.3d 578, 664 N.E.2d 1272, paragraph one of the syllabus.
At the outset, we note that the trial court, in its decision of July 25, 1997, sustaining in part defendants' motion for summary judgment, held that, because Swiggum was replaced by a forty-two year old male (Sean Boyle), Swiggum "failed to make out a prima facie case of age discrimination" under the fourth prong of the test in Barker v. Scovill, Inc. (1983), 6 Ohio St.3d 146. The trial court further noted, however, that Swiggum had alternatively argued that he would be able to establish direct evidence of age discrimination. The trial court ultimately concluded that, "in light of the fact that the Supreme Court of Ohio has not yet enumerated a test to guide the trial and lower appellate courts in review of age discrimination cases premised on direct evidence," and based on the court's view that the case was "extremely fact intensive," Swiggum had presented "evidence sufficient to create genuine issues of material fact and let a jury decide the case."
Following the trial of this case, the trial court, in its decision and entry overruling defendants' motion for judgment notwithstanding the verdict, again noted that it had found, "prior to trial * * * that plaintiff could not, as a matter of law, satisfy the four part test" set forth in Barker, supra. The court further noted that in the trial of this matter plaintiff "was forced to present his case `the old fashioned way' by providing evidence of any kind which showed that, more likely than not, defendant Ameritech `was motivated by discriminatory intent.'"
While Swiggum has not directly challenged, on appeal, the trial court's finding that he failed to satisfy the fourth element of the Barker test, he nevertheless appears to dispute defendants' contention that he did not establish discriminatory intent indirectly under Barker. Specifically, in a footnote in his appellate brief, Swiggum, while conceding that he was replaced by someone over the age of forty, argues that whether the age difference was "substantial" was a matter for the jury to decide. In support, Swiggum cites to a United States Supreme Court decision, O'Connor v. Consolidated Coin Caterers Corp. (1996),116 S.Ct. 1307.
In O'Connor, the Supreme Court rejected the requirement, under McDonnell Douglas Corp. v. Green (1973), 93 S.Ct. 1817, that a plaintiff alleging he was discharged in violation of the Age Discrimination in Employment Act of 1967 ("ADEA") must show that he was replaced by someone outside the age group protected by the ADEA. The court held that "[b]ecause the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." O'Connor, supra, at 1310. While the court did not provide a definition of "substantially younger," under the facts of O'Connor, the plaintiff was age fifty-six at the time he was fired and his replacement was age forty.
Despite the decision in O'Connor, a number of Ohio appellate courts, including this court, have continued to apply the four-part test in Barker. See, e.g., Smith v. E.G. Baldwin Assoc., Inc. (1997), 119 Ohio App.3d 410, 414; Cruz v. S. DaytonUrological Assoc., Inc. (1997), 121 Ohio App.3d 655, 659 (citing four-part Barker test); Krause v. Young Men's Christian Assoc.
(Dec. 10, 1998), Cuyahoga App. No. 73828, unreported.
In a recent federal decision, Pasko v. American NationalCan Co. (N.D.Ohio 1998), 998 F. Supp. 807, 811, the court observed:
 * * * [T]he Supreme Court of Ohio has not altered its test under Ohio law in accordance with O'Connor, supra. Instead, the Supreme Court of Ohio has continued to apply the prima facie elements announced in Barker, supra, when considering a case of age discrimination under OHIO REVISED CODE Chapter 4112. Byrnes v. LCI Communication Holdings Co., 77 Ohio St.3d 125
* * * .
Other Ohio appellate courts have utilized similar reasoning in continuing to apply the four-part Barker test. See Srail v. RJFInternatl. Corp. (1998), 126 Ohio App.3d 689, 698 (while recognizing that O'Connor did away with the requirement that a plaintiff be replaced by someone under forty years of age, the court noted that in Byrnes, supra, "the Ohio Supreme Court once more set forth the four-part test articulated in Barker, supra");McCafferty v. Cleveland Bd. of Educ. (May 27, 1999), Cuyahoga App. No. 74237, unreported. In light of the Ohio Supreme Court's adherence to the Barker test in Byrnes, supra, we agree with defendants' contention that Swiggum did not indirectly prove a prima facie case of discrimination under Barker.
However, even assuming that Swiggum had directly challenged the trial court's finding that he could not satisfy the four part test in Barker, supra, and further assuming O'Connor to be the controlling authority, we would still conclude that Swiggum failed to establish a prima facie case under a modified McDonnellDouglas method. As noted above, the court in O'Connor did not define the term "substantially younger." However, at least one federal court has defined the term as "ten years or more." Scottv. Parkview Memorial Hosp. (C.A.7 1999), 175 F.3d 523, 525, citingMiller v. Borden, Inc. (C.A.7, 1999), 168 F.3d 308, 313 andHartley v. Wisconsin Bell, Inc. (C.A.7, 1997), 124 F.3d 887,892-893. Moreover, at least one Ohio appellate court has cited with approval Hartley, supra, for the proposition that, where a plaintiff was replaced by an individual who was less than ten years older than the plaintiff, there was not a sufficient disparity in age to establish a prima facie case under McDonnellDouglas.
Accordingly, the issue before this court is whether the trial court erred in denying defendants' motion for directed verdict or for judgment notwithstanding the verdict based on defendants' contention that Swiggum failed to present competent direct evidence of age discrimination. This court has previously noted that, "[a]ccording to Byrnes, `in a cause of action for age discrimination under R.C. 4112.02 or 4112.14, when relying upon the direct evidence standard * * * an employee must prove a causal link or nexus between evidence of a discriminatory statement or conduct and the prohibited act of discrimination to establish a violation.'" Smith, supra, at 416, citing Byrnes, supra, at 130.
At trial and during closing argument, Swiggum pointed to a number of circumstances that, it was contended, permitted the trier of fact to infer discrimination on the part of Ameritech. Part of plaintiffs' evidence of discrimination involved Swiggum's own testimony that he made termination decisions during Ameritech's reduction in force program in 1993 based on pension eligibility considerations. Specifically, Swiggum testified that, at the time of the initial Breakthrough process, he had eleven area managers reporting to him and, as a result of Breakthrough, he was required to reduce the number of managers to eight by 1994. Swiggum stated that he believed "everybody was capable of doing the job," but that he "chose the three oldest people" based on pension considerations. (Tr. Vol. II, 23.)
Defendants point out that plaintiffs failed to present evidence that anyone other than Swiggum considered pension eligibility as a factor in the selection process. Upon review, we find that the record supports defendants' contention. When asked on direct examination whether he believed that the policy he implemented was endorsed by his superiors, Swiggum merely indicated that he had "no reason to believe that that wasn't the overall direction that all of my peers were using." (Tr. Vol. II, 28.) During cross-examination, Swiggum acknowledged that in prior deposition testimony he stated that he was not aware of any directive or instructions on the part of management that younger workers should be preferred to older workers in making selection decisions.
More significantly, there was no evidence presented to support an inference that Swiggum's supervisor, Knowling, took into consideration pension eligibility in his decision to terminate Swiggum. We note that, while Swiggum testified that he considered pension eligibility in selecting employees for reduction during Breakthrough, Swiggum's termination occurred approximately two years after the reduction in force program was initiated. The evidence presented fails to show any causal relationship between the conduct Swiggum alleges he personally engaged in during Breakthrough and the adverse employment action taken two years later.
Even assuming that Swiggum had presented evidence that the motivating factor in terminating some employees was pension eligibility, we would agree with defendants' position that such evidence, standing alone, does not give rise to an inference of age discrimination. In Heck v. Bd. of Trustees, Kenyon College
(S.D.Ohio 1998), 12 F. Supp.2d 728, the court addressed a similar argument in which a discharged employee asserted discriminatory intent based on her contention that an employer's reason for terminating her was to save money. The court rejected plaintiff's contention, holding that:
 * * * As the Supreme Court noted * * * "there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age." Hazen Paper Co. v. Biggins, 507 U.S. 604, 609, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). In particular, the Supreme Court held that the ADEA only protects employees terminated because of the stereotypical notion that the employee's productivity and competency deteriorate with age. See id. at 610, 113 S.Ct. 1701. When the motivating factor in an employer's decision to terminate an employee is "pension eligibility, salary or some other correlate with age unrelated to ageist stereotypes, such decisions are not actionable disparate treatment." 1 Barbara Lindemann 
Paul Grossman, Employment Discrimination Law
591 (Paul W. Cane, Jr., ed., 3d ed. 1996). Cf. Biggins, 507 U.S. at 611, 113 S.Ct. 1701
("Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily `age based.'") * * *
Swiggum's claim that Ameritech engaged in age discrimination also included the contention that, during the reduction in force activities resulting from Breakthrough, the company had a policy of hiring recent college graduates. However, even assuming that recent college graduates were hired during a period of reduction in forces, Swiggum would still be required to show a nexus between a large-scale termination of existing employees and the limited hiring of new ones. In re Western Dist.Xerox Litigation (W.D.N.Y. 1994), 850 F. Supp. 1079, 1089 (even though employer did some hiring of recent college graduates during a period of reduction in forces, such evidence, in the absence of a nexus between the employer's large-scale termination of existing employees and its limited hiring of new ones, did not create an issue whether the company engaged in a pattern of discrimination; "[I]t is difficult to imagine a corporation this large never having to hire new employees in some areas, even during an overall reduction in force"); see, also, McGuigan v. CAE Link Corp.
(N.D.N.Y. 1994), 851 F. Supp. 511, 514 (no evidence to support a finding that policy of exempting new hires and recent college graduates from consideration from termination adversely affected plaintiff's particular employment, or that it had a disproportionately negative effect on members of the protected age group).
Defendants correctly note that, in the present case, there was absolutely no evidence indicating that Swiggum's termination was linked to the hiring of a recent college graduate, nor was there any evidence that Knowling's particular organization even hired a college graduate. Thus, the fact Ameritech may have hired some recent college graduates during a period of reduction in force fails to support an inference of age discrimination.
Swiggum also presented evidence regarding certain comments made by company officials that Swiggum construed as age-related. Specifically, Swiggum testified that Jackie Woods, the president of Ameritech Ohio, Ohio Bell, "strongly suggested" to him in 1993 that two workers, Jerry O'Donnell and Gus Gardner, "weren't the kind of people that Ameritech was looking for to be part of the new organization after launch." (Tr. Vol. II, 23-24.) Woods indicated that these individuals were "old thinkers." (Tr. Vol. II, 24.) According to Swiggum, another Ameritech official, Gary Leidel, "strongly encouraged me to not keep Jerry O'Donnell." (Tr. Vol. II, 25.) Leidel mentioned that "O'Donnell was more autocratic in his style of management," and was "not the type of leader that Ameritech wanted." (Tr. Vol. II, 25.)
Defendants contend that, under Ohio law, the above comments, made by non-decisionmakers concerning employees other than plaintiff, and made remote in time from Swiggum's termination, are insufficient to support an inference of age discrimination. We agree. In Gordon v. Universal Electronics,Inc. (Oct. 1, 1997), Summit App. No. 18071, unreported, the court noted that:
 In order for such age-related comments to constitute direct proof of discrimination, there must be a nexus between the alleged comment and the prohibited act of discrimination. Byrnes v. LCI Communications, 77 Ohio St.3d at 130; Street v. Gerstenslager Co. (1995), 103 Ohio App.3d 156, 163, 658 N.E.2d 1105. "Absent some causal connection or link between an employer's discriminatory statements or conduct and a plaintiff-employee, there is no permissible inference that the employer was motivated by discriminatory animus to act against the plaintiff-employee * * *." Byrnes, 77 Ohio St.3d at 130. Thus, "derogatory co-worker comments do not substantiate a finding of employment discrimination, when such comments cannot be linked to the decisionmaker bringing forth the adverse action." Evans v. Jay Instrument and Specialty Co. (S.D. Ohio 1995), 889 F. Supp. 302, 310. Additionally, age-related comments which are "isolated, ambiguous, or abstract" cannot support a finding of age discrimination. Byrnes, 77 Ohio St.3d at 130. See, also, Phelps v. Yale Security, Inc. (C.A.6, 1993), 986 F.2d at 1020, 1025. There is a vital difference between comments which demonstrate a discriminatory animus in the decisional process and stray remarks made by nondecisionmakers. See, e.g., Wall v. Firelands Radiology, Inc. (1995), 106 Ohio App.3d 313, 329-30, 666 N.E.2d 235; Evans v. Jay Instrument and Specialty Co., 889 F. Supp. at 310 .
In the present case, Swiggum has failed to show a "link or nexus between the remarks and * * * [plaintiff's discharge] that could logically support the inference that * * * [his discharge was] the result of discriminatory intent." Byrnes, supra, at 129. Here, neither Woods nor Leidel were decision-makers with respect to Swiggum's business unit. Further, the statements, remote in time from Swiggum's termination, are not probative of Knowling's decision to terminate Swiggum. We also note that, during cross-examination, Swiggum's deposition testimony was introduced, in which he stated that he could not recall whether Woods had actually made a reference to age in discussing the employees at issue. Swiggum also acknowledged that he chose to hire those two employees despite Wood's comments. In any event, Swiggum did not present evidence that any discriminatory comments were made toward him by decision-makers. Swiggum acknowledged during cross-examination that neither Knowling nor Eibel ever made any derogatory comments about his age. In fact, he did not recall any Ameritech leader ever making a derogatory remark indicating a bias against him.
Swiggum's evidence at trial also consisted of statistical evidence. At trial, defendants objected to the admission of this evidence on the basis that plaintiffs lacked an adequate foundation, including an expert witness to testify about the meaning of the statistics. Counsel for Swiggum indicated that Swiggum himself would be testifying about the statistical evidence. Specifically, counsel stated that "Mr. Swiggum has a master's degree in engineering and is fully familiar with statistics." (Tr. Vol. I, 84.) The trial court ruled that the evidence could be admitted; the court further noted: "I don't think the case will rise or fall on this testimony." (Tr. Vol. I, 87.)
During Swiggum's direct testimony, plaintiffs offered a chart (Plaintiff's Exhibit No. 11) indicating that, for the years 1992 through 1994, 96% of the "terminations" involved workers over the age of forty. Swiggum testified that the numbers were compiled from a company document "of the people in salary grade 5 and above, those that were terminated." (Tr. Vol. II, 33.)
The top of the chart was titled "workforce," and that portion of the chart indicated that in 1994, eighty-five percent of the workers were over the age of forty, and that by 1997, seventy-eight percent of the workers were over the age of forty. Swiggum testified that "you can draw the conclusion that over the period of '94 to '97 the actual age of the Ameritech work force reduced by, you know, 7 percent." (Tr. Vol. II, 33.) Counsel for defendants objected to Swiggum's conclusion on the basis that he was "testifying as an expert." (Tr. Vol. II, 33.) Counsel for Swiggum offered to "qualify" what Swiggum did to arrive at his conclusion, and the court allowed counsel to proceed. Swiggum's counsel then asked Swiggum "what do you need to do from those numbers in order to develop percentages?" (Tr. Vol. II, 34.) Swiggum responded, "[w]ell, you would take the difference between them and then, you know, multiply the difference over the total that was left." (Tr. Vol. II, 34.) Swiggum's counsel asked Swiggum whether those figures confirm anything regarding policies of "letting go retirement-eligible people." (Tr. Vol. II, 35.) Swiggum responded, "[w]ell, that would substantiate the results of what actually happened. I mean, people that were older were leaving, and therefore the people that were left were — had to be younger than what they used to be with all of the older people leaving." (Tr. Vol. II, 36.)
Swiggum stated during direct examination that he was qualified to testify as to the statistics offered because "I have had an awful lot of math." (Tr. Vol. II, 34.) Swiggum indicated that his math background included one course in statistics in college.
Defendants contend that the statistical evidence presented did not constitute competent evidence of discrimination and that it was error on the part of the trial court to allow its admission. We agree.
In Adams v. Indiana Bell Telephone Co., Inc. (S.D.Ind. 1998), 2 F. Supp.2d 1077, 1098, the court noted:
 Statistical evidence may prove discrimination when it shows a pattern of conduct against a protected group that, if unrebutted, would allow the inference of intentional discrimination against individual members. Barnes v. GenCorp. Inc., 896 F.2d 1457, 1466 (6th Cir.), cert. den., 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990). The statistics, however, must show a "significant disparity" and must eliminate the "most common nondiscriminatory explanations for the disparity." Id. They must also bear a logical connection to the facts and circumstances being analyzed. * * * (Citations omitted.)
Further, "[f]or statistics to be valid and helpful in a discrimination case, `both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination.'" Simpson v. Midland-Ross Corp.
(C.A.6, 1987), 823 F.2d 937, 944. "Unless the statistics, standing alone or in comparison, are sufficient to lead the mind naturally to the conclusion sought, they have no probative value; they do not move the proof one way or another." Id.
In the present case, although Swiggum was not terminated as a result of the reduction in force brought about by Breakthrough, the statistics offered by plaintiffs were related to activities during this time period. Two federal cases, Allard v.Indiana Bell Telephone Co., Inc. (S.D.Ind., 1998),1 F. Supp.2d 898, and Adams, supra, cited in defendants' brief, are instructive regarding the use of statistical evidence in a reduction in force case. In Allard, the plaintiffs brought suit against Indiana Bell Telephone Co., Inc. ("Indiana Bell"), and sought to introduce statistical reports and expert testimony in support of their contention that Indiana Bell purposely targeted older workers during its 1992 workforce resizing program. Indiana Bell sought to have the report and testimony stricken from the record.
The court in Allard noted that there was no dispute about the age structure of Indiana Bell's management workforce prior to the reduction, nor was there any dispute that a greater percentage of workers aged forty or more were selected for termination, i.e., fifty-six of the fifty-nine selectees. The court stated, however, that the crucial issue for purposes of an age discrimination claim is "a determination of what caused the disparity." Id. at 906. The court found that the expert's analysis was flawed because, while the expert (Wertheimer) indicated that he was going to analyze the process of selecting employees for termination, he in fact only analyzed "the results
of the termination process." Id.
The court, in finding the expert's report inadmissible, held:
 * * * Wertheimer concluded that the "evidence in [his] report is consistent with the Indiana Bell 1992-1993 Workforce Resizing Program treating
employees at least age 40 differently from employees under age 40." * * * This conclusion is not based on an application of the scientific method for statistics, because it infers from statistics that merely demonstrate an association between two variables, that one variable caused the other. For that conclusion to be valid, the scientific method would require more than the cursory treatment applied by Wertheimer. * * *
 * * * Wertheimer did not conduct any other studies, using any different populations at Indiana Bell, nor did he account for the effects of plausible confounding variables by any method. Finally, Wertheimer explored no other plausible explanations for the effect between the independent variables. In other words, Wertheimer simply inferred from the fact that a greater number of older workers were selected for termination, that it was their age that caused them to be terminated. His methodology is not scientifically valid for answering the research question he actually posed (analyze the process of termination), nor is it valid for understanding the issue for which the plaintiffs seek to employ his opinions (showing disparate treatment). Id.
The court further found that, even if the expert's testimony were to be considered reliable, the evidence at issue would not pass the Evid.R. 403 balancing test. Specifically, the court held that "[t]he probative value of his questionable methodology, incomplete research, and shaky conclusions, would be substantially outweighed by the distinct possibility of confusing the jury about the relevant issues." Id. at 907.
Similarly, in Adams, supra, the same expert's findings were rejected. In Adams, the court noted that Wertheimer "included all of the employees who had volunteered to take early retirement among those described as `selected'" or involuntarily terminated. Adams, supra, at 1097. The court "found this to be a departure from generally accepted methods of scientific inquiry," and held that it would "not admit evidence about selection rates that ignores the factor of self-selection." Id. at 1102. The court further noted that the expert's analysis also failed to account for "any other independent variable that might explain the association between age and termination rates, including job skills, education, experience, or self-selection." Id. at 1101. The court held that "[f]or an ADEA claim, in a work force resizing or restructuring context that includes an early retirement incentive, it is imperative that the analysis take these `unusual circumstances' into account." Id.
Other courts have rejected the admission of similar statistical evidence based on the same infirmities. In Rea v.Martin Marietta Corp. (C.A.10, 1994), 29 F.3d 1450, the plaintiff's statistical evidence compared only the ages of employees retained with the ages of those laid off. The court noted that "[t]he statistics make no adjustment for the various performance evaluations and departmental rankings of the employees included in the statistical pool; accordingly, the comparisons involve employees who were not similarly situated." Id. at 1456. The court concluded that "[p]laintiff's statistical evidence fails to eliminate nondiscriminatory explanations for disparate treatment — i.e., that those laid off had lower performance evaluations and rankings than those retained — and therefore does not permit an inference of pretext." Id.
In Wilkins v. Eaton Corp. (C.A.6, 1986), 790 F.2d 515, the plaintiff, a discharged pilot, introduced a chart similar to the one presented by Swiggum in the instant case. The chart presented by the plaintiff in Wilkins indicated that the average age of pilots decreased during a certain period of time. The court rejected this evidence, noting that "the graph completely lacks specificity. For instance, the decrease in age could have resulted because several pilots retired or voluntarily transferred to non-flying positions, requiring younger pilots to be hired."Id. at 523. The court found the graph to be "insufficient circumstantial evidence to support the jury verdict in this case."Id.
In Gemmel v. Fairchild Space Defense Corp. (D.Md. 1993), 813 F. Supp. 1152, plaintiff cited a statistic indicating that, during a period of reduction in force, of 56 management employees discharged, fifty-three were over the age of forty. The court concluded that this statistic "by itself proves nothing. In order to have meaning, it must be compared against the age composition of the work force from which the employees were laid off." Id. at 1157. See, also, Krieg v. Paul Revere LifeInsurance, Co. (C.A.11, 1983), 718 F.2d 998, 1002 (statistical evidence that percentage of workers terminated over age 40 was greater than percentage of workers terminated under age forty did not support inference that company had a policy of terminating older employees: "There is no evidence as to how many general managers voluntarily resigned, took early retirement, stayed with the company but were promoted or returned to straight sales, or died prior to reaching the normal retirement age"); Chappell v.GTE Products Corp. (C.A.6, 1986), 803 F.2d 261, 268 (demotion statistics, which included anyone who left company for any reason, insufficient evidence to support inference of age discrimination).
In the present case, during cross-examination, Swiggum admitted that the chart he presented, indicating that ninety-six percent of employees "terminated" by Ameritech during Breakthrough were over age forty, included workers who left voluntarily. Swiggum acknowledged that, during the time period at issue, the company offered an incentive program for early retirement. Swiggum stated that the list of employees utilized in the statistics would have also included those who retired or were laid off, or who died, as well as any employees fired for violating company policies. Swiggum also admitted that, out of one hundred ninety-six employees who left the company during this time, he could not detail which employees left voluntarily as opposed to those involuntarily terminated. When asked whether it would be important, in compiling such statistics, to know whether the employees on the list were asked to leave or left voluntarily, plaintiff answered "no." (Tr. Vol. III, 54.) Plaintiff reasoned that such information was not important because "what we're talking about was the definition of termination, and we said it included all of those different categories." (Tr. Vol. III, 54.) Swiggum also failed to consider the age composition of the workforce prior to Breakthrough, although he acknowledged that such information "would certainly help" in being able to draw meaningful conclusions. (Tr. Vol. III, 68.)
Upon review, we conclude that the statistical evidence offered by Swiggum at trial was flawed, and that such evidence fails to support an inference of age discrimination on the part of Ameritech. Similar to the facts of Allard, supra, Swiggum, through the statistical evidence offered, sought to raise an inference of discrimination merely from the fact that, because a greater number of older workers were selected for "termination," it was their age that caused them to be terminated. As in Allard,
Swiggum's statistical evidence failed to take into consideration any independent variables that might explain the association between age and termination rates, including job skills, education, experience, performance or self-selection. Id. at 905. As noted, Swiggum's evidence did not even attempt to distinguish between employees who were involuntarily discharged and those who voluntarily exited the company, a flaw the court in Adams, supra,
found to be "unsupported by sound scientific principles." Id. at 1097. Nor did Swiggum's statistical evidence "eliminate the `most common nondiscriminatory explanations for the disparity." Id. at 1098.
Further, apart from the lack of probative value of this evidence, the statistics were not relevant to whether Swiggum was terminated on the basis of age. While the statistics presented purported to show discrimination as a result of Ameritech's reduction in force program, the evidence indicates that Swiggum was not terminated as a result of the Breakthrough program. Rather, Swiggum was awarded a job during the period of reduction in forces. Finally, we note that during closing argument, Swiggum's counsel cited these statistics in asserting that Ameritech was "pretty effectively getting rid of old folks," and that it was "pretty apparent what the pattern was, that the people that are discriminated against in terminations were those that were over 40." (Tr. Vol. IX, 86.) The effect of this evidence on the jury cannot be discounted, and we agree with defendants' contention that it was prejudicial error to allow its admission.
As further evidence of discriminatory intent, Swiggum contends that Ameritech failed to follow its own progressive disciplinary procedures prior to discharging him. However, an inference of age discrimination does not arise from the fact that an employer does not follow its termination procedures where there is no evidence that the terminated employee was treated less favorably than others on account of his age. Stanojev v. EbascoServices, Inc. (C.A.2, 1981), 643 F.2d 914, 923. Rather, a plaintiff would still be required to show a nexus between the conduct and the prohibited act of discrimination. Byrnes, supra,
at 130. In the present case, there are no facts showing a nexus between Ameritech's failure to follow its guidelines and Swiggum's age. Further, Swiggum failed to present evidence refuting the testimony of Diana Redman, a former human resource official with Ameritech, who stated that the practice of progressive discipline, as applicable to management employees, was changed following the advent of Breakthrough.
In his brief, Swiggum points to testimony by Knowling indicating that, when he took over for Eibel, he chose not to receive input from Eibel or to review performance appraisals offered by Eibel. Specifically, Knowling testified that he wanted to form his own impression of the people who would be working under his supervision. The only evidence on this issue, though, was that Knowling chose not to evaluate any employees based on past appraisals. Stated otherwise, there was no evidence indicating that Knowling considered such appraisals in making decisions regarding other similarly situated employees. Thus, even assuming that Knowling erroneously failed to use objective appraisals in his decision-making process, Swiggum has not shown that Knowling did so in a discriminatory manner. Risher v.Aldridge (C.A.5, 1989), 889 F.2d 592, 597. As noted by one federal court in the context of a discrimination claim under federal requirements, the ADEA "`cannot protect older employees from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated.'" Laurence v.Chevron, U.S.A., Inc., (C.A.5, 1989), 885 F.2d 280, 285, quotingBienkowski v. American Airlines (C.A.5, 1988), 851 F.2d 1503,1508. See, also, Stanojev, supra, at 921-922 ("an employer may fire a management-level employee, on the basis of subjective business judgments, for any reason that is not discriminatory. * * * In other words, the employer has the `prerogative to be shortsighted and narrowminded'").
Swiggum also asserted at trial that Ameritech involuntarily terminated older workers in order to replace them with workers based on gender and race considerations. Swiggum testified at trial that, shortly after Knowling assumed his duties, he commented at an organizational meeting that the "mix" of employees "does not look very good," and that this was "going to change." (Tr. Vol. II, 60.) During closing argument, Swiggum's counsel asserted that Ameritech "got rid of older people to ventilate the work groups and allow preferred affirmative action candidates to be promoted into higher slots."
The evidence does not indicate, however, that Swiggum's termination resulted in job opportunities for other employees based on gender or race. While Swiggum was replaced on an interim basis by a female, Helen Reedy (age forty-eight and a member of the protected age class), Swiggum's position was permanently filled by a white male over the age of forty. We agree with defendants' contention that plaintiffs' evidence on this issue is insufficient to raise an inference of discriminatory intent.
Swiggum also testified that, at a meeting he attended during Breakthrough, he was instructed by Gary Liedel, the executive in charge of human resources for Ohio Bell, to destroy interview sheets used to rate candidates. At trial, Swiggum pointed to this as evidence of discriminatory intent. We note that Ameritech witnesses disputed at trial the assertion that employees were told to destroy these notes. However, in construing the evidence most strongly in favor of plaintiff, and thus assuming that such an instruction was given, the evidence cited does not create an inference that Ameritech discriminated against Swiggum. As previously noted, Swiggum was not discharged as a result of Breakthrough. The evidence indicates he was offered a position as a result of that process. Moreover, the employee who made the comment, Leidel, was not a decisionmaker with respect to Swiggum's termination.
As further proof of discriminatory intent, Swiggum's counsel asserted during closing argument that when Ameritech employees reached the age of fifty they were "subtly" terminated. (Tr. Vol. IX, 87.) As an example, Swiggum's counsel pointed to a former Ameritech employee, Robert Humes, who retired from the company in 1996 at the age of fifty. Humes, however, testified that he retired voluntarily, choosing to accept Ameritech's offer of a separation package. Humes also testified that he was unaware of any instances during his employment at Ameritech in which the age of a candidate was considered as criteria in making selection decisions. There was simply no evidence indicating that Humes' retirement was the result of age discrimination.
Further, while there was evidence indicating that workers in their fifties exited the company, this fact alone is not determinative of discriminatory intent. We agree with defendants' contention that, in the absence of evidence as to the circumstances surrounding those decisions (i.e., evidence of discriminatory action against other employees discharged by Ameritech), the fact that workers of a particular age left the company is insufficient to support a finding of age discrimination. See, e.g., Leopold v. Baccarat, Inc. (C.A.2 1999), 174 F.3d 261, 271 (trial court did not err in excluding testimony that employees were "routinely" terminated when they reached their fifties and early sixties in the absence of evidence indicating the circumstances of the terminations other than the ages of the employees); Fields v. J.C. Penney Co., Inc. (C.A.5,968 F.2d 533, 537-538 (testimony that several people recently discharged happened to be approximately plaintiff's age insufficient evidence of age discrimination; there could have been any number of reasons for discharge of other employees aside from age discrimination and statement indicated nothing about reason for plaintiff's termination).
In Schrand v. Federal Pacific Elec. Co. (C.A.6, 1988),851 F.2d 152, 156, the court held that the testimony of two discharged employees about alleged statements to them concerning their age was not relevant to the claim of plaintiff where the decision-maker was not involved in the decision to terminate the two other employees. The court noted that neither of the two other employees worked in the division in which the employee worked, and that the plaintiff had made no claim that he was told he was being terminated because he was too old. Further, the court held that, even assuming the testimony to be relevant, in the absence of other direct evidence of age discrimination, the testimony should be excluded because its prejudicial impact was outweighed by its probative value. Specifically, the court held that "[a]lthough it had no direct bearing on the issue to be decided — whether Schrand was discharged because of his age — this testimony embellished the circumstantial evidence directed to that issue by adding `smoking gun' type evidence" * * * [which] offered an emotional element that was otherwise lacking." Id. at 156.
Moreover, "[t]he mere fact that an employer may have discriminated against other employees, standing alone, is insufficient." Byrnes, supra, at 130. Rather, "[t]he issue is whether this employee was discharged because of his age." Id. In the present case, evidence that workers over the age of fifty left Ameritech is, standing alone, not probative of the reasons underlying this particular plaintiff's termination. Fields,supra, at 538.
The critical issue in this case is whether the evidence presented by Swiggum was sufficient to convince a reasonable jury that the employer "more likely than not was motivated by discriminatory animus." Mauzy, supra, at 587. As noted above, the statistics offered by Swiggum simply carry no weight. Nor do the other circumstances cited by Swiggum indicate conduct by the employer that could be linked to a finding that Swiggum was terminated on account of age. Upon review, we conclude that the evidence presented to the jury, even construed most strongly in favor of plaintiff, was such that reasonable minds could come to but one conclusion, that conclusion being adverse to plaintiff's claim that Ameritech discriminated against him because of his age. Based upon our determination that the evidence fails to support the jury's verdict that Swiggum was discharged because of his age, defendants' motion for judgment notwithstanding the verdict should have been granted. Accordingly, defendants' first assignment of error is sustained.
In light of our disposition of the first assignment of error, finding that the trial court erred in failing to grant defendants' motion for judgment notwithstanding the verdict, defendants' second, third and fourth assignments of error, as well as Swiggum's single cross-assignment of error on cross-appeal regarding the trial court's ruling on the issue of punitive damages, are hereby rendered moot.
We will now address the assignment of error raised by plaintiff Rectanus. Under his single assignment of error, Rectanus contends that the trial court erred in failing to compel certain discovery materials.
By way of background, on November 29, 1996, plaintiffs filed a motion to compel and for sanctions. On December 16, 1996, defendants filed a memorandum in opposition to plaintiffs' motion to compel. In the memorandum, defendants asserted that plaintiffs' Interrogatory No. 13 was overbroad, requesting defendants to identify every single job classification and employee by age for a company employing thousands of employees in five different states. Defendants asserted that, in a discrimination action such as the present, a plaintiff did not have the right to discover data regarding employees outside the business unit responsible for his termination.
In the trial court's entry of July 25, 1997, the court addressed plaintiffs' motion to compel and for sanctions. That entry provides in part:
 With regard to the Motion to Compel, the Court held a status conference with the parties on February 21, 1997 to discuss the issues in the motion * * *. At that time, the Court made certain oral orders to the parties regarding the discovery disputes. The parties also advised the Court that they would attempt to agree upon a resolution of the discovery issues in question. To date, the Court has not been contacted by the parties with an indication that the discovery issues were not resolved. As such, the Court sua sponte
DISMISSES the Motion to Compel and for Sanctions as moot. If the parties need the intervention of the Court in the future with regard to these matters, they can file an appropriate motion.
In his brief, Rectanus argues that the court scheduled a status conference for July 31, 1997, "at which time plaintiffs once again raised their dispute with Ameritech over the production of the requested discovery." Rectanus also contends that "the trial court ruled that by August 14, 1997 Ameritech produce the remaining discovery which had not been previously produced but was ordered at the last status conference." We note that, while the record indicates a status conference was scheduled on that date, there is no entry indicating any discovery orders on the part of the trial court. Rectanus acknowledges that on August 15, 1997, defendants served a supplemental response to plaintiffs' interrogatories. Rectanus contends, however, that defendants "lumped together termination information for the years 1992 through 1994 and then separately set out information for each of the following years," thereby making it "difficult to compare this information by year."
Defendants contend that plaintiffs never filed a subsequent motion to compel, and thus defendants were deprived of the opportunity to make a record demonstrating that, under cover of an August 15, 1997 letter, they produced several computer-generated reports containing various employee data to satisfy plaintiffs' interrogatories. In response, Rectanus contends in his reply brief that he made every effort to preserve this issue for appeal and to have the court address the fact that requested discovery was not produced.
A trial court has "broad discretion in controlling the discovery process." Feichtner v. Cleveland (1994), 95 Ohio App.3d 388,397, citing Stegawski v. Cleveland Anesthesia Group, Inc.
(1987), 37 Ohio App.3d 78. In the absence of an abuse of discretion, an appellate court will not overturn the trial court's ruling on discovery matters. Stegawski, supra, at 397, citingVinci v. Ceraolo (1992), 79 Ohio App.3d 640.
In the present case, Rectanus has failed to show that the trial court abused its discretion. As noted above, in the trial court's entry of July 25, 1997, dismissing as moot plaintiffs' motion to compel, the court indicated that "[i]f the parties need the intervention of the Court in the future with regard to these matters, they can file an appropriate motion." The record fails to indicate that plaintiffs ever filed such a motion. In his reply brief, Rectanus points to portions of the transcript in support of his contention that he preserved this issue. The pages cited, however, involve discussions by counsel regarding the admissibility of plaintiffs' statistical evidence that the court allowed to be introduced at trial. While plaintiffs' counsel argued that defendants had been slow in responding to discovery requests, counsel's argument was directed at the fact that some discovery materials had just been recently obtained ("[w]e got them literally weeks ago"), as opposed to the failure to provide such materials. (Tr. Vol. I, 85.) We do not construe the arguments raised by plaintiffs' counsel as an attempt to formally renew plaintiffs' motion to compel. Further, as previously noted, Rectanus acknowledges that defendants submitted discovery materials in August of 1997. Assuming that these materials were incomplete, Rectanus had ample opportunity before trial to apprise the court of this situation. Under these circumstances, including the apparent availability of documents and plaintiffs failure to renew their motion to compel, as well as the limited record before this court regarding this issue, we find no abuse of discretion on the part of the trial court.
The single assignment of error of Rectanus is without merit and is overruled.
Accordingly, defendants' first assignment of error is sustained, defendants' second, third and fourth assignments of error, as well as the cross-assignment of error of plaintiff Swiggum, are rendered moot, while plaintiff Rectanus' single assignment of error is overruled. Based upon the foregoing, the judgment of the trial court is affirmed in part and reversed in part and this matter is remanded to the trial court for further proceedings in accordance with law and consistent with this opinion.
Judgment affirmed in part, reversed in part; and cause remanded.
BRYANT, J., and LAZARUS, P. J., concur.