Stephen SCHAFER, Plaintiff

v.

State of MARYLAND, Defendant.

Civil No. AMD 07–1213.

United States District Court, D. Maryland.

May 27, 2008.

---

Darren Margolis, Bierer Margolis P.A., Baltimore, MD, for Plaintiff.

John S. Nugent, Office of the Attorney General, Baltimore, MD, for Defendant.

## MEMORANDUM OPINION

ANDRE M. DAVIS, District Judge.

Stephen Schafer, an employee of the Maryland Department of Health and Mental Hygiene (DHMH), instituted this employment discrimination action alleging that the DHMH discriminated against him because he is a white male by failing to promote him to the position of Medical Care Program Manager in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000 *et seq.*, ("Title VII"). Discovery has been completed and now before the court is defendant's motion for summary judgment. The motion has been fully briefed and no hearing is needed. For the reasons stated within, the motion shall be granted.

### I.

Plaintiff began working for the State in 1975 as a Financial Agent with the Spring Grove Hospital Center, a division of DHMH. (Plaintiff's Exhibit 1 ("PX"), p. 31.) In approximately January 1979, he was promoted into the Medicaid Program and served as an Insurance Section Administrator. He continued in that capacity until December 1994, when he took a position as a Medical Care Program Supervisor with DHMH. (Defendant's Exhibit A ("DX"), pp. 33–36) Currently, he is a Medical Care Program Supervisor with DHMH's Beneficiary Enrollment Services, a position he obtained in May 1998. (*Id.* at 10–11)

In January 2006, a position for Division Chief of the Beneficiary Enrollment Call Center (Medical Care Program Manager III) became available. (DX B, "Recruitment and Examination Announcement") According to the minimum qualifications listed in the job announcement, applicants were expected to have "[f]our years of supervising employees in developing and

applying policies and regulations or directing a health program or project in a medical assistance program." (PX 7)

Of an initial 40 applicants for the position, 27 failed to meet minimum qualifications. The remaining 13 applicants were ranked as "qualified." (DX C, Def.'s Answers to Interrog. No. 10) A Selection and Evaluation Committee, consisting of five individuals randomly selected from within DHMH, reviewed the 13 remaining applications and determined that eight applicants, including plaintiff, would be interviewed. (Def.'s Answers to Interrog. 9)

Following the interviews, the Selection and Evaluation Committee recommended four individuals for further consideration by the Final Selection Committee. (DX A, p. 61) Again, plaintiff was included. The Final Selection Committee consisted of three individuals: Patricia Nowakowski, Lisa M. Kulishek, and Patricia Rutley–Johnson. All are white females. Two of the members of the Final Selection Committee, Nowakowski and Kulishek, are "friends" of plaintiff; the other, Rutley–Johnson, was listed by plaintiff as one of his references in his application.

Each of the four remaining applicants was interviewed by the Final Selection Committee. Following the interview, each of the applicants was given approximately one hour to provide an answer to a writing exercise designed for the applicants. (DX A, pp. 68–69) The Final Selection Committee, voting 2–1, decided that the Division Chief position should be offered to Elise Green–Watford, an African–American female who was one of two external candidates. Kulishek and Rutley–Johnson were persuaded that Green–Watford represented the strongest match for the position. (DX B, p. 93; DX E, pp. 11–12) In particular, Kulishek and Rutley–Johnson decided that Green–Watford's experience working in private industry in several managed care organizations, as well as her experi-

ence in working with Medical Assistance Programs, made her the more highly-qualified applicant. (DX B, p. 12; DX E, pp. 62–67) Nowakowski disagreed. She concluded that plaintiff was the most highly qualified applicant based on his experience in State service that related directly to the Division Chief job qualifications. (DX D, pp. 19–20) The Final Selection Committee's choice was ratified by DHMH and Green–Watford accepted the appointment. She is presently plaintiff's supervisor.

At the time of the application process, the supervisory hierarchy at DHMH was as follows: Charles Lehman was the Executive Director; Mary Dehart was the Deputy Executive Director; Kulishek was the Director of Eligibility; and Nowakowski was the Deputy Director of Eligibility. Rutley–Johnson was a senior staff member. (PX 3, p. 13; DX C, No. 9) In respect to plaintiff's theory of the case, the supervisory hierarchy is important because the gravamen of his claim is that either Kulishek or Rutley–Johnson or both selected the African–American applicant, Green–Watford, as a result of pressure from Deputy Executive Director Dehart.

In other words, plaintiff relies in significant part on what he asserts is "direct evidence" of racial discrimination. According to Nowakowski, during the application process, she was present at a meeting with Lehman, Dehart and Kulishek during which Dehart allegedly told her that an African–American female should be hired for the position. (PX 3, p. 11) At a later date, allegedly, Dehart told Nowakowski that "the Department was lacking African–American female management and we had to hire some." (PX 3, p. 14) According to Nowakowski, Dehart would have had to approve the selection of the new Division Chief after the Final Selection Committee made its decision. (DX D, pp. 13–14) On deposition, Dehart denied making the

statements that Nowakowski attributes to her and she also denied that she had any material involvement in the selection process. She testified: "My instruction to [the selection committee] was to pick the candidate they thought was the best suited for the position." (PX 4, p. 11)

Nowakowski also remembered a conversation with Rutley–Johnson which occurred sometime between the first and second round of interviews for the position. (PX 3, p. 16) According to Nowakowski, Rutley–Johnson said that "this position was a done deal, and an African American female was going to be hired." (*Id.*) Schafer's recollection of the remark, however, is that Rutley–Johnson "didn't say anything about Black or White . . . She just said, Mary Dehart will never let you get that job." (DX, pp. 78–79)

## II.

■ Under well-settled Title VII principles, plaintiff may avoid summary judgment (and ultimately prove his case) in one of two ways. First, he may rely on direct or circumstantial evidence of sufficient probative force to support an inference of discrimination. *See, e.g., Hill v. Lockheed Martin Logistics, Mgmt., Inc.,* 354 F.3d 277, 287 (4th Cir.2004) (en banc). As the Fourth Circuit recently observed:

If a plaintiff has presented "direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision," he is under no obligation to make out a prima facie case. *Diamond v. Colonial Life & Acc. Ins. Co.,* 416 F.3d 310, 318 & n. 4 (4th Cir.2005). In establishing evidence of discrimination, derogatory remarks may constitute direct evidence, as long as the remarks were related to the employment decision in question and were not stray or isolated. *Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 608 (4th

Cir.1999), *abrogated on other grounds by Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). [Plaintiff's] evidence must clearly indicate a discriminatory motive and illustrate a nexus between that motive and the adverse employment action. *Id.*

*McCray v. Pee Dee Regional Transp. Authority,* 263 Fed.Appx. 301, 305–06 (4th Cir.2008)(unpublished).

■ Second, he may prove his case of intentional discrimination by using the burden-shifting proof scheme originally formulated for failure-to-hire cases in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To make out a *prima facie* case of a discriminatory denial of promotion under the *McDonnell Douglas* criteria the plaintiff must establish that: (1) he is a member of a protected class; (2) his employer had an open position for which he applied or sought to apply; (3) he was qualified for the position; and (4) he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 959–60 (4th Cir. 1996).

■ If the plaintiff establishes a *prima facie* case, a presumption of discrimination arises. The presumption may be rebutted by the employer articulating a legitimate nondiscriminatory reason for its employment decision. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The employer's burden is one of production and not of persuasion. *Id.* The employer " 'is not required to prove absence of a discriminatory motive, but merely articulate some legitimate reason for its action.' " *E.E.O.C. v. Clay Printing Co.,* 955 F.2d 936, 941 (4th Cir.1992) (*quoting E.E.O.C. v. Western Electric Co. Inc.,* 713 F.2d 1011, 1014 (4th Cir.1983)). If the employer

meets this burden, the presumption of discrimination is eliminated, and the plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the employer's nondiscriminatory reasons are pretextual and that the adverse employment action was actually taken because of the employee's protected status, here race and gender. *Hicks,* 509 U.S. at 511, 113 S.Ct. 2742.

### III.

### A.

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. Summary judgment is appropriate only if a rational trier of fact could not find for the non-moving party in light of the record as a whole. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, the facts, as well as the inferences to be drawn therefrom, must be viewed in the light most favorable to the non-moving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Defendant argues that plaintiff's discrimination claims fail as a matter of law because (1) plaintiff cannot establish a *prima facie* case of disparate treatment discrimination; (2) DHMH had legitimate non-discriminatory reasons for its selection of another applicant; and (3) plaintiff cannot establish that DHMH's reasons for selecting Green–Watford were pretextual. In opposing defendant's motion, plaintiff makes two assertions. First, he contends that, viewing the record evidence in the light most favorable to him, he has generated genuine disputes of material fact as to

whether his "direct evidence" of discriminatory animus is sufficient to convince a reasonable juror to find in his favor. Second, and in the alternative, he contends his showing under the burden-shifting scheme of *McDonnell Douglas* is sufficient to (1) establish a *prima facie* case of gender and race discrimination and (2) to generate a genuine dispute of material fact as to pretext.

### B.

The plaintiff relies on *Jeffers v. Thompson,* 264 F.Supp.2d 314 (D.Md.2003), to support his contention that he has presented "direct evidence" sufficient to demonstrate that he was discriminated against, rendering the *McDonnell Douglas* analysis unnecessary. In *Jeffers,* the plaintiff alleged racial discrimination in a failure to promote claim. There, the court found that the statements by the supervisor to the plaintiff that he could not "start promoting a lot of blacks to super grades" constituted direct evidence of animus, obviating the need to resort to the *McDonnell Douglas* analysis. *Id.* at 325.

*Jeffers* provides scant support to plaintiff here, however. In *Jeffers,* a three member selection panel made recommendations to the acting director. The acting director then interviewed the applicants and made the ultimate hiring decision. *Id.* at 320. The *Jeffers* court found that direct evidence of discrimination was set out because the same acting director who made the hiring decision also allegedly made the discriminatory comments. *Id.* at 325.

Here, by contrast, a Final Selection Committee was established to make the final determination regarding who should be offered the Division Chief position. Mary Dehart, who allegedly made the discriminatory remarks in this case, was not on the Final Selection Committee and played no formal role whatsoever in the

committee's non-selection of plaintiff. While plaintiff presents evidence to show that Dehart was a supervisor of one of the two members of the Final Selection Committee who declined to select plaintiff for promotion, he relies solely upon speculation in implying that Dehart actually influenced committee members Kulishek (Dehart's subordinate) or Rutley–Johnson to reject plaintiff because he is male or Caucasian. In short, there is no direct evidence whatsoever to show that Kulishek and Rutley–Johnson were improperly motivated by race or gender in their decision. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir. 2004) (an employer is not liable for an improperly motivated person who merely influences a decision, but for the person who in reality makes the decision).

Accordingly, plaintiff may not proceed on his "direct evidence" theory. Even assuming that Nowakowski's hearsay testimony would be admissible at trial, Dehart's alleged statements fall into the category of "stray remarks," unconnected as they are with the decision-makers. *Cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) ("Stray remarks in the work place ... cannot justify requiring the employer to prove that its ... decisions were based on legitimate criteria. *Nor can statements by non-decision makers or statements by decision makers unrelated to the decisional process itself suffice to satisfy the plaintiff's burden in this regard.*")(O'Connor, J., concurring)(emphasis added). Moreover, no reasonable juror could reasonably find on the basis of Dehart's report that the State intentionally discriminated against him on the basis of race or gender. Thus, plaintiff's "direct evidence" theory fails.

### C.

■ As plaintiff cannot maintain his claims on the basis of direct evidence of race or gender discrimination, it is necessary to turn to the *McDonnell Douglas* analysis. It may be assumed that plaintiff has established a *prima facie* case, inasmuch as: (1) he is a member of a protected group, i.e., male and white; (2) he was, indisputably, qualified for the job for which the employer was seeking applicants; (3) he was rejected; and (4) he was rejected under circumstances giving rise to an inference of unlawful discrimination, i.e., an African–American woman was selected. *Cf. Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ("The burden of establishing a prima facie case ... is not onerous."). Nevertheless, as a matter of law, plaintiff fails to generate a genuine dispute of material fact as to whether defendant's nondiscriminatory reasons for his non-selection are pretextual and that the adverse employment action was actually taken because of plaintiff's race or gender.

■ The two members of the Final Selection Committee who voted for Green–Watford, Kulishek and Rutley–Johnson, have been consistent in explaining their legitimate, nondiscriminatory reasons for finding Green–Watford more highly qualified than plaintiff. Relative employee qualifications "are widely recognized as valid, non-discriminatory bases for any adverse employment decision." *Evans v. Technologies Applications and Serv. Co.*, 80 F.3d 954, 960 (4th Cir.1996). Green–Watford had a background that qualified her for the Division Chief position. She obtained a Bachelor of Science degree in Business Management from Morgan State University. (DX B, Green–Watford Application) From August 1996 to February 2000, she served as Provider Relations Manager at Johns Hopkins where she was responsible for educational visits on regulatory changes and program procedures to providers, vendors, and facilities, and per-

formed cost analysis of prospective vendors. (*Id.*) Between 2001 and 2006, she worked for various private sector corporations working in the Medicaid field including employment as a Provider Relations Network Contractor for Maryland Physicians Care, Provider Relations Manager at Sierra Military Health Services, Network Account Manager at United Healthcare of the Mid Atlantic, and Vendor Relations Coordinator at XLHealth Corporation. (*Id.*)

*Plaintiff's counsel* argues that Green–Watford did not meet the minimum qualifications for the Division Chief position. The job announcement stated that, in order to be minimally qualified, an applicant needed "Four years of supervising employees in developing and applying policies and regulations or directing a health program or project in a medical assistance program." (PX 7) *Plaintiff's counsel* contends that Green–Watford did not meet these qualifications. (Opp. Memo., pp. 6–11)

*However, in his deposition, plaintiff readily admitted that Green–Watford was qualified for the position,* stating "I mean you can't say the woman is not qualified," and noted that Green–Watford not only was approved by two members of the Final Selection Committee but "got through Personnel, she got through the first selection committee, and she got to the finals, so it's not a question of is she qualified." (DX A, pp. 88–89) Instead, plaintiff felt that his qualifications were far superior to Green–Watford's. (*Id.*) (Plaintiff also expressed the view that, as his supervisor over nearly two years, Green–Watford is a "great lady." (*Id.* at 22)). Indeed, Green–Watford was one of 13 applicants ranked as "best qualified" by the DHMH's Recruitment and Selection Division and one of four finalists recommended by the Selection and Evaluation Committee consisting of five employees randomly selected from within the DHMH. (DX C, Answers to Interrog. Nos. 9 and 10). As defendant notes, the determination that Green–Watford was best qualified and a finalist for the Division Chief position occurred prior to Green–Watford even getting to the Final Selection Committee. *Plaintiff's counsel's* argument that Green–Watford was not qualified for the position, contradicted by plaintiff himself, wholly lacks merit.

The two members of the final selection committee who voted for Green–Watford, Kulishek and Rutley–Johnson, identified what in their views were Green–Watford's superior qualifications, her superior interview responses and her better performance on the writing exercise as the reasons for voting to offer the Division Chief position to her. (DX B, pp. 11–12; DX E, pp. 11–12) According to Rutley–Johnson, Green–Watford had comprehensive experience in both substantive areas of responsibility for the position: working with managed care organizations and working with medical assistance programs. (DX B, p. 13) Plaintiff, in contrast, had proficiency in only one of the two areas. (*Id.* at 12–13)

Kulishek testified that Green–Watford had "broader experience" than plaintiff and that, although both plaintiff (with whom she enjoyed a personal friendship) and Green–Watford were highly qualified, Green–Watford was "best qualified." (DX E, p. 62–67). She also said that Green–Watford performed better on the writing sample and in her responses to interview questions. (*Id.* at 53, 57)

■  Plaintiff argues his writing sample was better because of spelling errors contained in Green–Watford's writing sample. However, Rutley–Johnson and Kulishek stated that the spelling errors were not important in their evaluation of the writing samples; instead, they focused on the substance of the writing. (DX B, p. 75; DX

E, p. 53) As the Fourth Circuit has said, a plaintiff "cannot establish pretext by relying on criteria of [the plaintiff's] choosing when the employer based its decision on other grounds." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 271 (4th Cir.2005).

As to the interviews, Kulishek testified that plaintiff failed to provide an example for one of the interview questions and gave an incorrect response to another question, while Green–Watford gave a better example on one of the questions. (DX E, pp. 57–59) Rutley–Johnson testified that Green–Watford answered questions more thoroughly and provided specific examples. (DX B, p. 87) While plaintiff believes he is more highly qualified than Green–Watford, " 'it is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff." *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 960–961 (4th Cir.1996) (*citing Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir.1980)). Ultimately, the employer has discretion to choose between equally qualified candidates. *See Evans*, 80 F.3d at 960. Manifestly, plaintiff has failed to generate a genuine dispute of material fact on the issue of pretext.

## IV.

Plaintiff lacks probative "direct evidence" of discrimination and defendant has offered legitimate nondiscriminatory reasons for awarding the position to Green–Watford rather than to plaintiff as to which plaintiff has filed to generate a genuine dispute of material fact as to pretext. Accordingly, the motion for summary judgment shall be granted. An Order follows.